**ST. CHARLES VENTURES, L.L.C.,**

v.

**ALBERTSONS, INC.**

No. Civ.A. 02–2839.

United States District Court,
E.D. Louisiana.

Feb. 25, 2003.

Randall A. Smith, Owen Bennett St. Amant, Smith & Fawer, LLP, New Orleans, LA, for Plaintiff.

William R. D'Armond, Glenn Michael Farnet, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, LLP, Baton Rouge, LA, Curtis Allen Hennesy, Kean, Miller, Hawthorne, D'Armond, McCowan &. Jarman, LLP, New Orleans, LA, for Defendant.

### *ORDER AND REASONS*

DUVAL, Distrct Judge.

Before the Court is a Motion for Summary Judgment (Doc. 4) filed by St. Charles Ventures, L.L.C.("SCV"). SCV seeks summary judgment against defendant, Albertson's, Inc. ("Albertson's"),[1] on Albertson's counterclaim which seeks rescission of the lease which is the subject of the instant suit. Having reviewed the pleadings, memoranda, exhibits, and the relevant law, the Court finds that such motion must be granted and the counterclaim dismissed.

---

**1.** The Court will refer to "Albertson's" rather than "Albertsons" as that is how the name is denominated in the Lease at issue herein.

## Background

SCV is a limited liability corporation organized under the laws of the State of Louisiana with its principal place of business in St. Charles Parish; it is engaged in the business of real estate development, in particular grocery store properties, in Louisiana. (Petition, ¶¶ 1 and 4). Albertson's is a corporation organized under the laws of the State of Delaware, authorized to do and doing business in the State of Louisiana, with its principal place of business in Boise, Idaho. (Petition, ¶ 4).[2] SCV contends that prior to and through 1997, SCV began the process of purchasing properties located in an area known as Central City in New Orleans. Its intentions were to create an area of property (the "Property") for the development of a grocery store to serve the needs of residents of Central City and surrounding areas. This process was started allegedly at the request of Save–A–Center. (Petition, ¶ 6). On December 12, 1997, SCV was contacted by Bob Rissing, an Albertson's executive, regarding Albertson's developing one of its stores on the Property. Such discussions culminated in SCV and Albertson's entering into a Contract to Lease on April 10, 1998, which contemplated the development of approximately 253,450 square feet of land in Central City into an Albertson's supermarket. (Petition, ¶ 8).

The effort to consolidate the area originally contemplated was allegedly thwarted by certain Save–a–Center representatives who purchased land contained in the original area in order to block the development. SCV contends that it then found a new development parcel, one block away at the corner of Felicity and Carondelet Streets.

SCV eventually purchased all of the various titles and structures and development on the new parcel was unanimously approved by the New Orleans City Council in October, 1999. (Petition, ¶ 9).

On or about December 22, 1999, SCV and Albertson's executed a "Shopping Center Lease" (the "Lease"). The Lease provides for Albertson's to pay annual rent to SCV in the amount of $600,000 per year (Lease, § 3.1(i) at p. 3(Exhibit "B" to the Petition)) from the date of the Lease execution to the "Building Transfer Date", a date contemplated in the lease where, following the issuance of a Notice of Completion of the construction of the grocery store, SCV agreed to purchase from Albertson's the building and site improvements for the sum of $2,500,000. After the Building Transfer Date, SCV was to receive $980,000 in annual rent. (Petition, ¶ 10). The term of the Primary Term of the lease was to be 25 years. (Petition, ¶ 11). Albertson's agreed to build and operate a grocery store of approximately 68,000 square feet on the leased property. The lease was amended four times. (Albertson's Counterclaim, ¶ 11).

The first amendment on May 26, 2000, essentially extended the deadline to clear all vertical structures from August 1, 2000, to October 10, 2000, as well as the period for Albertson's to pay the annual $600,000.00 in rent. (Petition, ¶ 17–18). The second amendment on June 15, 2000, extended the same deadlines to October 25, 2000. The third amendment on June 1, 2001, made some substantive changes to the lease dealing with the date on which SCV could purchase the building and site improvements and receive rent escalation-

---

**2.** While it is required under the local rules of this Court that a separate statement of uncontested facts be filed by the moving party, to which a response is required by the nonmoving party, neither such a statement, nor such a response was filed in this matter. As such, the Court will use the petition, answer and counterclaims as filed in order to flesh out the allegations at the heart of this matter.

that being on or after December 21, 2001 and prior to the issuance of a Notice of Completion. (Petition, ¶ 20).

On July 21, 2001, Historic Renovations, Inc. announced the redevelopment of the St. Thomas Public Housing site in the Lower Garden District which included the construction of a Super Wal–Mart. (Preservation Resource Center Position Paper on Proposed St. Thomas Redevelopment Project/Super Wal–Mart, September 5, 2001). This project was met with substantial public debate and continued litigation because of the financing and public moneys to be used in its development.

On August 29, 2001, Albertson's received final approval from the City of New Orleans for the building of its grocery store. (Petition, ¶ 22). Albertson's own press release notes that "plans were submitted after eighteen months of research, community surveys and the development of a unique concept to ensure the new store reflects the history and fabric of Central City." ' The project was to be put out to bid on September 24, 2001. (Petition, ¶ 22).

On December 21, 2001, SCV placed $2,500,000 in an escrow account allegedly triggering the $980,000.00 a year rent. On February 14, 2002, a Fourth Amendment to the Lease was executed. It gave Albertson's until August 28, 2002, to commence construction of the 65,287 square foot store. SCV alleges that this amendment was requested by Albertson's to permit it to "value engineer" the proposed design of the grocery store, in order to make it more affordable in terms of costs of construction. (Petition, ¶ 24).

On April 18, 2002, the City Council approved a resolution allowing the construction of a Wal–Mart Supercenter Store. Then Mayor Morial approved the measure on April 24, 2002.

A series of letters and notifications between SCV and Albertson's started about April 24, 2002. SCV sought to close its permanent financing for SCV's commitments under the Lease on July 15, 2002. On July 3, 2002, Albertson's sent a letter to SCV, via certified mail, informing SCV that the Lease "has been terminated due to a failure of cause under Louisiana law." (Exhibit K to Motion for Summary Judgment). In that letter, counsel stated:

As you know, Albertson's selected the Premises as a site for a grocery store because it was a site that the Landlord represented to be a market area protected from competition. Albertson's looks for sites that are free from competition because the stores are able to operate profitably and Albertson's capital investment would be protected. In fact, because there were no other competitors in the trade area and it was represented that no competitors could enter the market, Albertson's agreed to pay a premium in rent for the Premises. The Premises are no longer protected from competition. Clearly, the entry of Walmart into the market area surrounding the Premises has destroyed Albertson's motive for leasing the Premises and made it useless for Albertson's to locate and build a profitable store on the Premises. Therefore, there is a failure of cause that vitiates the contract.

*Id.* In that letter, Albertson's intention of filing a lawsuit to obtain a declaratory judgment rescinding the lease is noted as well.

The instant lawsuit was filed by SCV in Civil District Court for the Parish of Orleans on or about July 16, 2002. In that petition, SCV seeks (1) specific performance, or in the alternative alleges (2) anticipatory breach of contract, (3) bad faith anticipatory breach of contract, (4) detrimental reliance, and (5) violation of

the Louisiana Unfair Trade Practices Act. The matter was then removed to this Court based on its diversity jurisdiction on September 16, 2002, Albertson's having been served with the action on August 19, 2002. (Doc. 1, Notice of Removal).

On September 20, 2002, Albertson's filed its Answer and Counterclaim. (Doc. 2) It seeks rescission of the Lease based on (1) failure of cause under La. Civ.Code arts. 1966 and 1967; (2) error of cause under La. Civ.Code arts.1948–1950; and (3) impossibility of performance under La. Civ. Code arts. 1873–1878. It is this counterclaim that SCV seeks to dismiss by summary judgment. The basis of Albertson's claim for rescission is that it entered into the subject contract in the belief of the "**improbability** of future entry into the market area" (Counterclaim, ¶ VI) (emphasis added) by a competitor such as a Wal-mart Supercenter. As such, Albertson's maintains that the location was "**reasonably insulated**" from competition. (Counterclaim, ¶ V) (emphasis added). Albertson's thus contends that at the time the lease was executed, "Albertsons **reasonably believed** that no competition for a large, superstore competitor like Wal-Mart Supercenter existed or would develop. In fact, it was **virtually inconceivable** that a Wal-Mart Supercenter or similar superstore would be developed in the market area of the leased site." (Counterclaim, ¶ VIII) (emphasis added). Based on the three Louisiana law doctrines cited above, Albertson's contends that based on its subjective belief with respect to possible competition, it is entitled to rescission of the Lease.

## Standard for Motion for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Stults v. Conoco,* 76 F.3d 651, 656, (5th Cir.1996), (citing *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 912–13 (5th Cir.1992)) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial."* *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis supplied); *Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1995).

Thus, where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court notes that the substantive law determines materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Furthermore, as this Court is exercising its diversity jurisdiction, it sits as an *Erie* court and must apply Louisiana law in an

attempt to rule as a Louisiana court would if presented with the same issues. *Musser Davis Land Co. v. Union Pacific Resources,* 201 F.3d 561, 565 (5th Cir.2000), *citing Erie R. Co. v. Tompkins,* 304 U.S. 64, 79–80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Mozeke v. Int'l Paper Co.,* 856 F.2d 722, 724 (5th Cir.1988). As stated in *Musser:*

> To determine a state law question, we first look to decisions of the Louisiana Supreme Court. *See Transcontinental Gas v. Transportation Ins. Co.,* 953 F.2d 985, 988 (5th Cir.1992). If the Louisiana Supreme Court has not spoken on the issue, it is our duty to determine as best we can what that court would decide. *See id.; Hulin v. Fibreboard Corp.,* 178 F.3d 316, 318–19 (5th Cir.1999).

*Musser,* 201 F.3d at 563–64.

Because of the unique character of the issues presented, it is important to review Louisiana's Civilian methodology with respect to interpreting its law. As stated by the United States Court of Appeals for the Fifth Circuit:

> Under Louisiana's Civil Law tradition, courts look first and foremost to statutory law. The Louisiana Civil Code instructs that "[sources of law are legislation and custom,]" and that "[l]egislation is a solemn expression of legislative will." "[T]he primary basis of law for a civilian is legislation, and not (as in the common law) a great body of tradition in the form of prior decisions of the courts." The concept of *stare decisis* is foreign to the Civil Law, including Louisiana. Therefore, in cases such as this we are guided by decisions rendered by the Louisiana appellate courts, particularly when numerous decisions are in accord on a given issue—the so-called *jurisprudence constant*—but we are not strictly bound by them.

We are also guided by the Louisiana legislature's own declarations of how it intends statutes to be interpreted. Words are given their generally prevailing meaning, and the meaning of ambiguous words is "sought by examining the context in which they occur and the text of the law as a whole." "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." But "[w]hen the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." In addition, "[w]hen a statute is susceptible to two or more interpretations, that which affords a reasonable and practical effect to the entire act is to be preferred to one which renders part thereof ridiculous or nugatory."

*Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.,* 953 F.2d 985, 988 (5th Cir.1992) (footnotes omitted). Thus, the Louisiana Civil Code provides the source and framework by which this Court must review the counterclaim at issue. The Court now turns to the legal basis of Albertson's counterclaim and examines its claims in light of the Louisiana Civil Code, its comments, and *jurisprudence constant* with respect to the code articles upon which Albertson's depends.

### Failure of Cause

Albertson's relies on articles 1966 and 1967 to claim that it is entitled to rescission based on "failure of cause." Article 1966 provides, "An obligation cannot exist without a lawful cause." La. Civ.Code art. 1966. Article 1967 provides:

> Cause is the reason why a party obligates himself.

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

La. Civ.Code art.1967. In the Revision Comments of 1984, it is noted that this article changed the prior code article to define cause in terms of "reason," rather than "motive" for "the importance of judicial discretion in characterizing an obligation as enforceable." Generally, these articles are employed in the context of a detrimental reliance claim to enforce the terms of a contract. *See Newport v. Sears,* 6 F.3d 1058, 1068–69 (5th Cir.1993).

Nonetheless, it is clear that "[a] cause may exist at the inception of an obligation and then fail." Litvinoff, *Still Another Look at Cause,* 48 La. Law Rev. 3, 8 (1987). Indeed, the sole case cited in Albertson's counterclaim concerning "failure of cause" is *WBR Corp. v. State of Louisiana,* 711 So.2d 337 (La.App. 1st Cir.1998) which specifically relies on La. Civ.Code art. 1875 which defines "fortuitous event." Thus "failures" of cause are further defined in the Code. Indeed, in the cited article by the learned Saul Litvinoff, he uses as his primary example of "failure of cause" a fortuitous event where the entire performance becomes impossible. Another basis for rescission is where there is an error of cause. Thus, the "failure of cause" inquiry in the case at bar collapses into an analysis of the effect of an error and/or a fortuitous event on the alleged "cause" of the contract at issue herein.

The Court will first address the issue of rescission for error.

**Rescission for Error**

The four elements of a valid contract include the following: (1) the parties must possess the capacity to contract; (2) the parties mutual consent must be freely given; (3) there must be a certain object for the contract; and (4) the contract must have a lawful purpose. *Provenza v. Central & Southwest Services, Inc.,* 34,162 (La.App. 2nd Cir. 12/15/00), 775 So.2d 84. Consent may be vitiated by error. La. Civ.Code art.1948. Article 1949 states, "Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." [3] As to error that concerns cause, the Code provides:

Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded or should in good faith have regarded as a cause of the obligation.

La. Civ.Code art.1950.

■ Error as to cause can result in the rescission of the contract, even when the error is unilateral. In *Marcello v. Bussiere,* 284 So.2d 892 (La.1973), the Louisiana Supreme Court rescinded the sale of a bar-lounge business and a related lease based on a vice of consent. The Bussieres were a retired couple seeking to invest funds, secured by borrowing on a home mortgage, in a small operating business that would give them some security. As such, they leased a property known as the "Joy Lounge" and purchased bar equipment from the lessor. The business had

---

**3.** The Revision Comments of 1984 note that while the article is new, it does not change the law; it articulates the ideas found in La. Civ.Code arts. 1823, 1825 and 1826 (1870).

been closed for about six months prior to the negotiations because the alcoholic beverage license had been revoked by the City of Gretna. While there was a written agreement to purchase the bar equipment and a verbal agreement as to a two year lease, neither the act of sale nor lease were ever executed; nonetheless, the Bussieres paid the $6500 purchase price for the business and equipment and paid two months rent, electricity and insurance. During that time they engaged in extensive renovations of the premises.

Subsequently, the Bussieres were informed that they could not get an alcoholic beverage license. Indeed, "[w]hen the purchasers contacted the Chief of Police of Gretna, they were informed he would not approve a license for them to operate the business." Without the Chief of Police's approval, a license was not obtainable. Marcello, the seller-lessor, sought performance of the contract, but the Bussieres sought to set it aside. The Louisiana Supreme Court held that "[s]ince the purchasers received no going business and could not secure a license to operate, we conclude that there was an error in the principal cause of the contract." *Id.*, The contract was rescinded.

In reaching this conclusion, the predecessor code articles to articles 1949 and 1950 were cited by the Louisiana Supreme Court and bear repeating here. Comments to the present day article 1950 state that while the article itself is new, it restates the principles found in Louisiana Civil Code arts. 1824–1846 (1870). The Revision Comments of 1984 specifically state that the revision did not change the law. In *Marcello*, the Louisiana Supreme Court, examining the prior articles, explained:

> As to error, the Louisiana Civil Code provides:

Article 1825:

> The error in the cause of a contract to have the effect of invalidating it, must be on the principal cause, when there are several; this principal cause is called the Motive, and means that consideration without which the contract would not have been made.

Article 1826:

> No error in the motive can invalidate a contract, unless the other party was apprised that it was the principal cause of the agreement, or unless from the nature of the transaction it must be presumed that he knew it.
>
> Error in determining motive or principal cause, vitiates consent and invalidates a contract. Error as to a subsidiary motive has no effect upon the validity of a contract. *Cryer v. M & M Manufacturing Co., Inc.,* La., 273 So.2d 818 (1973); *Stack v. Irwin,* 246 La. 777, 167 So.2d 363 (1964); *Carpenter v. Skinner,* 224 La. 848, 71 So.2d 133 (1954).

*Marcello,* 284 So.2d at 894–95. Thus, while the new article speaks in terms of "cause", the commentators to the revised Code article 1949 note:

> According to the French text, the "principal cause", rather than the "motive" is that cause without which the contract would not have been made. This is sufficiently expressed by "cause" without resorting to "principal cause," which is redundant. Even when an obligation has multiple causes, error that bears on any one of them is sufficient to make the obligation invalid. See Capitant, De la Cause des obligations 44 (1923).

La. Civ.Code art.1949, Revision Comments–1984 (e).

Thus, there is a line of cases where error as to cause has been recognized and contracts rescinded.[4] Many of these cases

4. For an extensive review of case law with respect the application of error under La.

concern error with respect to the nature of the thing sold and its suitability for its intended use. In *Gisclair v. Matmoor, Inc.*, 537 So.2d 876 (La.App. 5th Cir.1989), purchasers of unimproved property which purchasers believed could be developed for commercial use and vendors and their agents were aware of purchasers' intentions, were entitled to rescission of the purchase because the court found that consent was vitiated by error. Purchasers, the Gisclairs, prior to the sale informed the defendants specifically that they did not want to purchase wetlands. After the sale and after purchasers began to place various commercial improvements on the land with a "revocable permit" from the Army Corps of Engineers, the Gisclairs were informed that the property was indeed designated as wetlands and could not be commercially developed. Apparently, the land had always been so designated; however, neither party knew that at the time of the sale. Nonetheless, the court found that because the principal cause and sole purpose for the sale was to develop the land for commercial use, the contract must be rescinded.

Another case, relied on by the *Gisclair* court is *Louviere v. Meteye*, 260 So.2d 377 (La.App. 4th Cir.1972). In that case, the court found that the principal reason for the purchase of land was again for the development of a commercial enterprise.[5] The purchaser knew that the property was zoned commercial for a depth of 250 feet North of Airline Highway and believed that the property fell within those bounds. No survey was taken, but plaintiff later paced it off and found that it was not within the 250 foot commercially zoned area. Because the principal cause was to purchase commercial property, the court rescinded the sale.

*Jefferson Truck Equip. Co. v. Guarisco Motor Co.*, 250 so.2d 211 (La.App. 1st Cir. 1971) provides another example of where error as to the cause of the sale concerned the nature of the thing sold. A crane seller sought to enforce a verbal sale of a truck mounted crane. The court found that there was an error of fact that allowed for the rescission of the sale because the buyer had accepted the seller's bid for the crane under the mistaken belief that its grade capacity met the purchasers requirements, of which the seller had knowledge.

In *Nugent v. Stanley*, 336 So.2d 1058 (La.App. 3d Cir.1976), the purchasers of an on-going business believed they bought a business with a good credit reputation and $12,000 to $15,000 worth of executory contracts for the installation of carpet. These beliefs were found to be the principal causes of the sale. In reality, the credit rating of the company was poor, only two executory contracts existed and the value and income of the business had been grossly exaggerated to the purchasers. As such, the court found that consent based on these errors of fact vitiated the contract because there was error as to the principal causes which prompted the purchase, and the court rescinded the contract.

Accordingly, most of these case deal with the suitability of the thing purchased in relation to the reason or cause of the purchaser so doing. One case stands out from that general rubric. In *Carpenter v. Williams*, 428 So.2d 1314 (La.App. 3d Cir. 1983), Williams was informed that a new

---

Civ.Code arts.1948–1952, *see* George Bilbe, *Mistaken Assumptions and Misunderstandings of Contracting Parties in Louisiana Law and in the Restatement (Second) of Contracts*, 59 La. Law Rev. 769 (1999)

**5.** Indeed, the agreement to purchase the land contained the condition that the sale was subject to the property being zoned commercial.

requirement of his job was that he move from Lafayette to an area closer to Cameron or else he would lose his position and would be transferred to offshore work. As a result, he undertook to find a house in Lake Charles and eventually found a house. He signed an offer to purchase which was contingent upon three things. Prior to purchase, Carpenter was informed that he was no longer required to move and thus refused to purchase the house. The appellate court found failure of cause because his sole motive for purchasing the house had failed. Thus, it is possible that cause is not necessarily tied to the suitability of the thing. This case, however, may be considered an anomaly in that the court may have treated as "cause" that which was more properly considered a motive that would not present grounds for rescission. *See* Bilbe, *Mistaken Assumptions, supra*, 59 La.Rev.Stat. at 831–832.[6]

The court must further examine article 1950 and the proper interpretation of an error as to "cause" that would give rise to rescission. The commentators provide further elucidation as to "cause" and "error" in section (f) of the Revision Comments–1984 to article 1950:

> Under this Article, an error in a party's motive, that is an error confined within the bounds of a party's subjectivity, does not invalidate consent. As ex-

pressed in Capitant, De la cause des obligations at 209–210 (1923): "Error makes the contract annulable when it concerns the act of will through which the party bound himself. Otherwise, that act of will being complete and non-vitiated preserves its obligatory effect. As a consequence, an error which does not affect the manifestation of will remains inoperative. **That is the reason why an error in the motive does not annul the contract even though it exerts a decisive influence on the obligation.** A party who buys a horse because he erroneously believes that his own has perished, or a donor whose will is determined by an erroneous motive, would not have contracted had he been correctly informed; nevertheless the sale or the donation are nonetheless valid. Although the motives rest in the subjective sphere of the individual, they no doubt prompt him to engage himself, but they nevertheless, remain beyond the contractual field, they are anterior to the act of will by which the party obligates himself; they are not a constitutive element of the act of will." Capitant, *supra*, at 209–210 (1923). See also 6 Planiol et Ripert, Traite pratique du droit civil francais 222–224 (2d ed. Esmein 1952); 1 Litvinoff, Obligations 394–396 (1969). That conclusion is consis-

---

**6.** The author of the note states:

> Surprisingly, the court rescinded the agreement. The purchaser labored under no error at the time the contract was made, and Louisiana's concept of failure of cause did not require a decision conditioning the enforceability of the agreement upon the continuation of his need for the property. The court certainly would not have rescinded the transaction if a formal act of sale had been executed prior to the employer's change in its residency requirement. Similarly, there would have been no need to regard the purchaser's assumption concerning his employer's policy as a ground for rescission if the employer, unbeknownst to

the parties, had terminated the residency requirement before the purchase agreement was made. To the contrary, such an assumption readily could be classified as an error concerning the purchaser's "motive" which supplies no justification for rescinding the purchase of an object having all attributes it was believed to have. Despite the sympathies the purchaser's situation might evoke, the agreement was not expressly conditioned upon the continuation of the employer's policy, and the commitment to purchase very reasonably could have been enforced according to its terms. *Id.*

tent with the approach taken by the Louisiana jurisprudence. In *Tri–Parish Bank & Trust Company v. Richard,* 280 So.2d 850 (La.App. 3rd Cir.1973), writ denied 283 So.2d 499 (La.1973), where a payee did not know, and could not be presumed to have known, the maker's motive for signing a promissory note had been to protect a corporation in which the maker owned an interest, the court concluded that even if such was the maker's principal motive, error as to that motive could not invalidate the note. La. Civ.Code art.1950, Revision Comments–1984 (f) (emphasis added).

Thus, there is another line of cases where a party sought rescission on the basis of error, and the courts found that the error was not one of "cause" but of motive. In *Hanover Petroleum Corp. v. Tenneco, Inc.,* 521 So.2d 1234 (La.App. 3rd Cir.1988), the state appellate court was faced with a situation where the "unforseen collapse of the natural gas market and governmental restructuring of the industry" had allegedly rendered Tenneco's performance under certain "take-or-pay" gas [7] contracts untenable. The court characterized this argument as follows: "In effect, what Tenneco argues is that, had it anticipated the mentioned events, it would never have agreed to the terms of the Kaplan Contract, therefore its consent was the result of error." *Id.* at 1240. The court rejected such an argument. The court stated:

It is not within the province of the courts to relieve parties of their bad bargains. *Kenny v. Oak Builders, Inc.,* 256 La. 85, 235 So.2d 386 (1970). The principal cause of the Kaplan Contract was the sale and concomitant purchase of a certain volume of gas at a fixed price. There is no error alleged in regard thereto. The expectations of the parties as to the profitability of the contract are irrelevant to a determination of error. As stated by Judge Duhe in *Superior Oil Company [v. Transco Energy Co.], supra,* [616 F.Supp. 98 (W.D.La.1985) ]:

"Undoubtedly, Pipeline [Transcontinental Gas Pipeline Company] was in error as to its motive for entering into this obligation, the market has simply not evolved in the manner anticipated. But this error is far from an error in the obligation itself. And Pipeline has failed to establish an issue of fact as to whether there was error as to the principal cause of the contract, i.e., a certain price for a certain quantity of gas." *The Superior Oil Co., supra,* p. 109.

For these reasons we reject Tenneco's claim of error.

*Hanover,* 521 So.2d at 1240; *see Exxon Corp. v. Columbia Gas Transmission Corp.,* 624 F.Supp. 610, 612 (W.D.La.1985).

This analysis is found in cases that arise outside of the "take-or-pay" context. For instance, in *Martin Forest Products v. Grantadams,* 616 So.2d 251 (La.App. 2nd Cir.1993), Martin had entered into a consent judgment with Grantadams, an individual whose home was located next to the Martin mill. Martin had agreed to be enjoined from causing noises in access of a certain level pursuant to a plan submitted to the court. Martin tried to reduce the noise level; however, it apparently deviated from the plan. Eventually, Martin determined that it could not meet the sound

---

7. A "take-or-pay" contract is one where a purchaser agrees to annually take, or pay for if not taken, a quantity of gas from a produce. Where gas is paid for but not taken, the purchaser is given the right, under the contract to make up such volumes, during the term of the contract by taking volumes of gas, at a later date, above the minimum contract volume without charge. *See generally Hanover,* 521 So.2d at 1236.

restrictions because it cost more than anticipated even though it had retained and was advised by an expert prior to and during the negotiations leading to the consent agreement. The court refused to relieve Martin from its bargain. The court stated:

> We cannot remedy Martin's entering into a bad bargain. *Commercial National Bank in Shreveport v. Keene*, 561 So.2d 813, 815 (La.App. 2d Cir.1990). A court cannot undermine a contract simply because it was a bad deal for one of the parties. *Bergquist v. Fernandez*, 535 So.2d 827, 829 (La.App. 2d Cir.1988).

*Martin*, 616 So.2d at 254. The court also rejected Martin's claim that it was commercially impractical to comply with the consent judgment. "The fact that compliance with a contract or agreement may be more expensive than originally anticipated is no defense." *Id. citing Hanover.*

The analysis is similar in *Esplanade Oil & Gas, Inc. v. Templeton Energy Income Corp.*, 889 F.2d 621 (5th Cir.1989). Esplanade was the owner of certain oil and gas properties which it decided to sell. Templeton entered into a letter agreement to purchase same. That letter included the purchase price, a description of the Properties, and seven conditions precedent to closing. One condition, condition 49(c) stated that " '[t]here shall occur no adverse material change to the Properties or [Esplanade's] interest therein from the date of this letter to Closing.' " *Id.* at 623. There was an $8.50 drop in the price of oil on the spot market later in that month. Templeton then advised Esplanade that it was no longer willing to close because of the drop in the price of oil. Suit for breach of contract was instituted by Esplanade.

The United States Court of Appeals for the Fifth Circuit rejected the doctrine of failure of cause. Templeton asserted, *inter alia*, that its principal cause for entering the letter agreement was to obtain an "income stream," which failed as a result of the fall in the market price of oil. The court rejected that argument stating that the contract did not specifically provide for the purchase of an "income stream" and no language to that end appeared in the contract. The court did note that the economic evaluations made by Templeton were not made known to Esplanade and thus could not be imputed to Esplanade under art.1949. Nonetheless, relying on *Hanover* and *Exxon Corp.* it "reiterated the fact that a party to a contract cannot be heard to complain of lack of cause based on its projection of future market conditions which turned out to be incorrect." *Esplanade*, 889 F.2d at 626.

Yet another case relying on *Hanover* is *Shelton v. Congress Street Properties, Inc.*, 1993 WL 43637 (E.D.La. Feb.16, 1993) (Livaudais, J.). In that case, plaintiffs sought to rescind a sale of property that occurred on August 12, 1987, for which payments had been made continuously through September of 1991. Plaintiffs were informed some time between May and September of 1991 that a substantial portion of the property purchased had been designated as federal wetlands. Plaintiffs maintained that had they known that the property was classified as wetlands, they would never have purchased it. The court found that the property in question was not classified as federal wetlands until four years after plaintiff purchased the property. Analogizing the facts to *Hanover*, the court stated, "[a]s the *Hanover* court announced, a claim or error cannot be based on the fact that a party would never have entered into a contract had it anticipated a future event." *Shelton* at *3.

Saul Litvinoff has noted in respect of this line of cases:

> An error may be claimed concerning an event that, at the time a contract is made, was expected to take place in the

future, but does not take place. The question whether such an error, consisting of the wrong belief that something will occur in the future-hence, error in prediction or forecast is operative has so far received a negative answer. If the erroneous belief dwelled only in the party's subjective motivation and was never communicated to the other, it is easy to conclude that the alleged error is not one that concerns a cause of the obligation and is not therefore a ground for nullity. **Even when the other party knew, or should have known, of such a belief, the general conclusion is that the chance of a future event happening or not is a risk assumed by the party whose expectations will materialize if the event happens or will be frustrated if the event does not happen, a risk that in no manner should affect the other party's right to rely on the stability of transaction.** That is the conclusion reached in some Louisiana decisions.

Saul Litvinoff, *Vices of Consent, Error, Fraud, Duress and an Epilogue on Lesion,* 50 La. Law Rev. 1, 28 (1989) (emphasis added).[8]

■ With these parameters in mind, this Court must now examine whether Albertson's claim that its belief as to the improbability of a competitor entering the market as cause for the contract at hand provides a basis for rescission now that such a possibility exists because of the Wal–Mart project. Clearly the Code contemplates a situation where a motive in reference to a contract can constitute cause. Likewise, not every motive involving a contract is cause. Here, Albertson's

urges the impossibility of a Wal–Mart like outlet being constructed in the "market area" (which is never clearly defined except vaguely in Albertson's expert report of Burt P. Flickinger, III, Exhibit C to Albertson's Memorandum in Opposition) is the cause as contemplated under articles 1949 and 1950 of the contract. It also argues that SCV knew or should have known that this "impossibility" was a "principal cause" as designated in the predecessor articles. Therefore, if such an outlet would become a "possibility" then the principal cause fails and the contract can be rescinded.

This argument is facially provocative, but fundamentally flawed. Obviously the construction of an outlet in the "market area" was and is possible. There are procedures in place to effectuate such a possibility including obtaining zoning approvals, permits, etc. Moreover, it is clearly possible for such an outlet to buy or lease sufficient property to commence the procedure, particularly given the nature of the geographic area which Albertson's own expert describes as containing a high level of abandoned housing. This pellucid fact is recognized by Albertson's own terminology and/or description used throughout its pleadings: "virtually inconceivable," "reasonably insulated," "improbability," etc.

Albertson's did however conclude that the construction of such an outlet was remote and the Court will assume that SCV knew or should have known that Albertson's relied upon that assumption in signing the contract. The fact that the construction of a competing retail outlet in the market was a remote possibility was one of the "motives" for Albertson's to enter the

---

**8.** Albertson's provided the Court with a legal opinion as to the nature of Albertson's right to rescission based on failure of cause, error, force majeure and theorie de l'imprevision provided by Saul Litvinoff. While the Court finds his writings on these topics persuasive when provided in a neutral context, it will not consider the "opinion" provided here as Fed. R.Evid. 704 does not allow an expert to render conclusions of law. *Jarrow v. Cupit,* 2000 WL 1537989 (E.D.La. Oct.17, 2000).

contract. It was a calculated risk, a motive, but not a cause. Every reason that drove Albertson's decision to sign the contract is not a cause, or the principal cause, but some of those reasons are simply business decisions based on every day risk factors. Thus, Albertson's claim for rescission based on error has no merit. The Court will now turn to the third basis for rescission asserted by Albertson's-force majeure.

**Impossibility of Performance–Force Majeure**

Albertson's contends that the imminent development of a Wal-mart Supercenter in the "market area" creates an instance of impossibility of performance or force majeure, and thus it is entitled to rescission of the contract. Article 1873 of the Louisiana Civil Code provides:

> An obligor is not liable for his failure to perform when it is caused by a fortuitous event that makes performance impossible.
>
> An obligor is, however, liable for his failure to perform when he has assumed the risk of such a fortuitous event.
>
> An obligor is liable also when the fortuitous event occurred after he has been put in default.
>
> An obligor is likewise liable when the fortuitous event that caused his failure to perform has been preceded by his fault, without which the failure would not have occurred.

La. Civ.Code art. 1873. A fortuitous event is defined in article 1875 as "one that, at the time the contract was made, could not have been reasonably foreseen." La. Civ. Code art. 1875. Thus, it has been said that "[i]n Louisiana, absent absolute impossibility, an obligor is bound to render performance." Saul Litvinoff, *Force Majeure, Failure of Cause and Theorie de L'Imprevision: Louisiana Law and Beyond,* 46 La. Law Rev. 1, 3 (1985). Stated another way by the same author, "For

Louisiana courts, thus, and in a manner consistent with basic principles of the civil code, a contract must be enforced unless its performance has become absolutely impossible, because it is not the task of courts to help parties to rid themselves of bad deals, and it will be so enforced either by the primary remedy of specific performance or by the substitute remedy of damages for nonperformance." 6 La. Civ. L. Treatise, Law of Obligations § 14.16 (1999).

In *Esplanade Oil & Gas,* previously noted, the Fifth Circuit discussed the concept of force majeure. Templeton argued that the unforeseen plunge in the market price of oil prior to the closing date qualified under the doctrine of force majeure as a "fortuitous event" as defined by La. Civ. Code art. 1873. The court noted:

> The doctrine of force majeure relieves a party of a contractual obligation only when a fortuitous event "makes performance impossible." [La. Civ.Code art. 1873.] In this case, the decline in the market price of oil did not make Templeton's performance "impossible," it merely made Templeton's performance unprofitable. Thus the doctrine of force majeure does not apply. *See e.g., Schenck v. Capri Const. Co.,* 194 So.2d 378, 379–80 (La.App.Ct.1967).

*Esplanade Oil & Gas,* 889 F.2d at 625–26.

The court in *Hanover* was also asked by Tenneco to relieve it from performance of the "take-or-pay" contract with Hanover based on the doctrine of force majeure. In that case, it contended that the economic recession, the pricing scheme of the natural Gas Policy Act of 1978, the abundance of and the drop in the price of competitive fuels, the mild 1982–1983 winter, the increase in deliverability of fields committed to Tenneco under gas purchase contracts, and the delivery by producers of greater quantities of high cost gas rather

than lower cost gas in more than one price category constituted force majeure under the terms of the contract. Tenneco relied not only on the statutory concept, but a force majeure clause in the contract which included a catch-all provision: "any other causes, whether of the kind herein enumerated or otherwise."

In its analysis, the *Hanover* court noted that other courts had not granted summary judgment on the force majeure clause because it was "considerably broader than the statutory concept of force majeure." *Hanover*, 521 So.2d at 1238. Nonetheless, relying *Preston Oil Co. v. Transcontinental Gas Pipeline Corp.*, No. 294491, Div. "L", 19th Judicial District Court, Parish of East Baton Rouge, Louisiana (Dec.1986), the court refused to apply the concept either from a statutory basis or under the terms of the contract, finding no material question of fact as to the meaning of that portion of the take-or-pay contract language. The *Hanover* court stated:

"Moreover, defendant's strained interpretation of the obscure 'force majeure' clause cannot mean that changed governmental policy or regulation will suspend obligations under the contract. There are absolutely no criteria in the 'force majeure' provisions by which to judge when or how such changes would affect the contractual obligations. What degree of shifting governmental policy is required? Must the change be unfavorable? The 'force majeure' provisions do not address these issues because they were never intended to do so. Modifications in governmental policy and regulation are economic facts of life and are not a basis for suspending a contract."

*Hanover*, 521 So.2d at 1238-39 (citations omitted).

■ Albertson's argues that the entry of a Wal–Mart Supercenter is a "fortuitous event" under the doctrine's definition under the Civil Code. Such a position is devoid of merit. Albertson's relies on *WBR Corp. v. State of Louisiana, Through the Department of Transportation and Development*, 711 So.2d 337 (La.App. 1st Cir. 1998) for the proposition that "performance of a contract is considered impossible when a fortuitous event renders performance economically unfeasible." (Counterclaim pp. XXV). Such reliance is misplaced.

In *WBR Corp.*, the court relieved the State of Louisiana from an agreement to improve a road which has been exchanged for being granted a right of way through property owned by WBR Corp. The Department of Transportation and Development ("DOTD") had contracted with another property owner for certain property (the Chotin tract) to build a fleet landing facility thereon. The land in question was subject to the Corps of Engineers conditions for permitting. The Corps of Engineers required certain commitments prior to issuing a permit for the project. These requirements included that spillage from the servicing and repairing vessels would not enter the waterway if the proposed facility was constructed on the adjacent Chotin property. This condition rendered the project "unfeasible" and thus a fortuitous event which excused the DOTD from further improving the road in question. *See Nanny's Shoe Store, Inc. v. Beder & Company*, 394 So.2d 810 (La.App. 4th Cir. 1981). With the failure of the fleet landing facility project, the court found that "it would have been unreasonable to expect DOTD to proceed with the planned extension of the roadway once its motivation for doing so had, through no fault of its own, become unfeasible." While Albertson's tries to argue that this case stands for the proposition that economic unfeasibility provides a "fortuitous event", the Court finds such an application too attenuated from the facts. The acts of the Corps of

Engineers made the construction of the facility an impossibility because of the conditions imposed-not because the facility would not be economically viable.

In the case at bar, Albertson's contends that because it is "commercially impracticable or unfeasible" it should be relieved of its bargain. The court finds that this circumstance simply does not rise to the level necessary to revoke this Lease. As in the *Templeton* case, it is not "impossible" to build the store as contemplated, it merely makes Albertson's performance less profitable. In reality, Albertson's is asking the Court to recognize another legal theory known as the theorie de l'imprevision to relieve it of its bargain. This concept was also raised in the *Hanover* case and rejected and will be discussed in more detail *infra*.

There is a specific force majeure clause in the Lease, which should also be noted as it was cited in the Counterclaim at ¶ XXVII. In Section 35.9 of the contract which is in a section denominated as "General Provisions", it states:

> With respect to section 8.1 "force majeure" shall mean any delay caused by strikes, lockouts, fire or other casualty, the elements or acts of God, refusal or failure of governmental authorities to grant necessary permits and approvals for construction (as long as [Albertson's] has properly applied for such permits or approvals and has diligently attempted to obtain the same), or other causes other than financial, beyond the reasonable control of [Albertson's] or its contractors.

Pretermitting the issue of whether this clause only applies to Albertson's obligations to construct the building and site work as espoused by Albertson's in its opposition to the Motion for Summary Judgment, the Court finds that certainly the term "financial" in this context means, specifically, economic adversity to Albertson. Thus, even under the terms of the force majeure provisions in the contract, Albertson's is not relieved of its contractual duties.

**Theorie de L'Imprevision**

The defense of imprevision is essentially a French doctrine which permits judicial reformation of contracts whenever a drastic change in circumstances renders performance for one of the parties harsh. *Hanover*, 521 So.2d at 1240. One commentator argues for its inclusion in contract remedies.

> Revised article 1873 of the Louisiana Civil Code, providing in its first paragraph that an obligor is not liable for his failure to perform when it is caused by a fortuitous event that makes performance impossible, seems to preserve the traditional approach. That article, however, is inserted in a special section now devoted to impossibility of performance. When read together, the articles in that section disclose that there exists between impossibility of performance and the theory of cause a connection that was less explicit in the Louisiana Civil Code of 1870. When properly understood, that connection may serve as a foundation for a more flexible approach to force majeure.

Saul Litvinoff, *Force Majeure, Failure of Cause and Theorie of L'Imprevision: Louisiana Law and Beyond*, 46 La. L.Rev. 1, 3 (1985). That more "flexible approach" is the theory of l'imprevision. Litvinoff argues that this approach is not novel as it can be found and traced back to Roman writers; however, its application declined towards the end of the eighteenth century "owing to the prevalence of the economic and political theories of capitalism and liberalism where the rule has been that contracts must be honored regardless of 'any change in circumstances and regardless of cost, effort, or sacrifice to the obligor.'" *Id.* at 4.

Nonetheless, this theory has not been adopted by any Louisiana court, and as an *Erie* court, this Court will not accept an invitation to do so. As noted by another commentator analyzing the decision in *Hanover* to reject the theory of imprevision:

> The theory of imprevision has its origins in the public law of France, developed through the administrative tribunals shortly after the outbreak of World War I. In the seminal matter, the Conseil d'Etat afforded a utility company relief from certain terms in a contract with a municipality that had been entered into prior to the war, based upon the drastic turn of events. The tribunal, reasoning that the utility company should not be held to the provisions of the agreement as long as the extraordinary situation existed, granted the petition. Accordingly, the administrative court ordered the municipality to defray a portion of contractual charges that otherwise would have been due.

> Since its debut in France, the theory of imprevision has been used only by administrative panels and has been limited to public law contracts, typically agreements between utilities and municipalities. The Cour de Cassation, the chief French judicial body (or court of law), has refused to extend the boundaries of the doctrine. Several scholars have noted why the Cour de Cassation has refused to invoke imprevision in nonadministrative matters, including the following: the judicial courts may be concerned that the excuse of imprevision would encourage bad faith behavior of contracting parties and, therefore, result in an aggravation of the economic life of the community; because of the drastic intrusion of the courts into contractual affairs inherent in the application of the doctrine and because the relief is contrary to general civilian principles, the judicial courts believe that only the legislature should authorize this type of defense; and the doctrine is contrary to the civil law tradition of respecting the intentions of the parties as expressed through their agreements. In short, the theory of imprevision has not been extended because the public interest demands that respect for agreements lawfully confected be fortified, not diminished.

> Like the courts of law in France, the judiciary in Louisiana has refused to receive the doctrine of imprevision. No court in Louisiana has used the doctrine to modify or revise a contract. Indeed, before Hanover, it had been mentioned only twice-by former Justice Tate in his dissent in Cryer v. M & M Manufacturing Co., and in Armour v. Shongaloo Lodge No. 352 Free and Accepted Masons.

Bruce Shewe and Robert L. Theriot, *Developments in the Law, 1987–1988, A Faculty Symposium: Obligations,* 49 La. Law Rev. 463, 475–76 (1988) (footnotes omitted).

Considering the foregoing, the Court rejects the argument that it should use the theory of imprevision to relieve Albertson's in this instance.

### Conclusion

As an *Erie* court, this Court is bound to predict how the Louisiana Supreme Court would rule on the issues before it. There are Louisiana cases which have rescinded contracts when there was an error relating to the nature of the thing which was the *raison d'etre* of the transaction. Here had the property been contaminated, if there were an undiscovered restrictive covenant, if there were a wetlands issue or the like, perhaps summary judgment would not be appropriate.[9]

9. Considering the analysis herein, the Court further finds that holding this motion in abey-

The possibility of another competitor may have been remote, but was clearly possible. The fact that a Wal–Mart store may become a reality is simply not a failure of cause or error. The Louisiana courts have consistently held that incorrect assumptions about future events that may affect profitability are not grounds for rescission of a contract. This counterclaim is in the final analysis a plea to the Court to rescind the contract because Albertson's profit margin may be less than anticipated-the reason being that a remote possibility may become a reality. Plainly, this plea invokes the theorie of l'imprevision and equally plainly, Louisiana courts have rejected this doctrine. Accordingly,

**IT IS ORDERED** that the Motion for Summary Judgment (Doc. 4) filed by St. Charles Ventures, L.L.C. is **GRANTED** dismissing the Albertson's Counterclaim.

**IT IS FURTHER ORDERED** that finding there is no just reason for delay, judgment shall be entered dismissing the Counterclaim of Albertson's, Inc.

**IT IS FURTHER ORDERED** that the remaining claims are **STAYED** and the matter statistically closed pending appeal. In the event that Albertson's chooses not to appeal within the normal delays, St. Charles Ventures, L.L.C. shall move to reopen this case and reset this matter on the trial calendar of the Court.

ance until construction commences or it is finally known that there will be no construc-

tion as urged in Alberton's Supplemental Memorandum would have no purpose.