Louisiana Stadium & Exposition v. Financial Guaranty Insurance

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————————

August Term, 2010

(Argued: March 9, 2011                    Decided: November 6, 2012)

Docket No. 10-2030

————————————————

LOUISIANA STADIUM & EXPOSITION DISTRICT, STATE OF LOUISIANA,

*Plaintiff-Appellants,*

v.

FINANCIAL GUARANTY INSURANCE CO.,

*Defendant-Appellee,*

MERRILL LYNCH, MERRILL LYNCH & CO., INC., MERRILL LYNCH, PIERCE, FENNER
& SMITH, INC., FGIC CORPORATION,

*Defendants.*

————————————————

Before: WINTER, POOLER, HALL, *Circuit Judges*.

Appeal from United States District Court for the Southern District of New York (Preska,

*J.*) granting the motion of Financial Guaranty Insurance Co. to dismiss the complaint against it

pursuant to Fed. R. Civ. P. 12 (b)(6).

Affirmed.

Judge Hall dissents in a separate opinion.

————————————————

JAMES R. SWANSON, Fishman Haygood Phelps Walmsley Willis & Swanson, LLP (Lance C. McCardle, Alysson L. Mills, *on the brief*), New Orleans, Louisiana, *for Plaintiffs-Appellants Louisiana Stadium & Exposition District and State of Louisiana*.

BRIAN S. FRASER, Richards Kibbe & Orbe, LLP, New York, N.Y. (Shari A. Brandt, *on the brief;* Rudy J. Cerone, *pro hac vice*, McGlinchey Stafford PLLC, New Orleans, Louisiana, *on the brief*, *for Defendant-Appellee Financial Guaranty Insurance Corp*.)

POOLER, *Circuit Judge:*

Louisiana Stadium and Exposition District and the State of Louisiana (together, "LSED") seek to rescind an agreement to purchase bond insurance from Financial Guaranty Insurance Co. ("FGIC") and recover its $13 million premium payment. LSED bases its claim on failure of cause, a tenet of Louisiana law that requires all contracts be supported by cause - "the reason why a party obligates himself." La. Civ. Code. Ann. art. 1966, 1967. "Cause" is a broader concept than "consideration," because cause does not require anything be given in return. *Aaron & Turner, L.L.C. v. Perret*, 22 So. 3d 910, 915 (La. App. 1st Cir. 2009). Because we find that the principal cause of the agreement between the parties was the purchase of bond insurance to protect the bondholders in the event of default, not to reduce the interest rate LSED paid to borrow money, we affirm the district court's decision.

**BACKGROUND**

LSED owns the Superdome in New Orleans. FGIC is a stock insurance company with its principal place of business in New York, New York. In 2005, LSED sought to refinance its existing debt to take advantage of lower interest rates. LSED eventually accepted a proposal from Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") to serve as lead underwriter and broker-dealer for the proposed bonds. In March 2006, LSED issued approximately $240

2

million in auction rate securities (the "Bonds").  Auction rate securities ("ARS") are long-term, variable rate securities that have their interest rates reset periodically at Dutch auctions.  At a Dutch auction, buy orders are filled starting with the lowest rate bid until all the securities offered for sale are matched with purchase orders.  The rate at which the final sell order is filled is known as the "clearing rate," and the clearing rate applies to all outstanding ARS in that issue until the next Dutch auction.

In connection with the Bonds being issued, LSED purchased $13 million in bond insurance from FGIC, purchasing both a Municipal Bond New Insurance Policy and Municipal Bond Debt Service Reserve Fund Policies (together, the "Policies").  LSED alleges that it "understood that its future interest payment savings would be substantially greater than the amount of the premium paid to FGIC."  LSED alleges that it expected that the Policies would "wrap" the Bonds with FGIC's triple-A credit rating, making the Bonds more attractive to investors.

In 2008 - two years after the bonds were issued - FGIC lost its triple-AAA credit rating after it came to light that FGIC invested in risky credit default swaps and subprime mortgage markets.  FGIC eventually was stripped of its credit ratings altogether, and was ordered by the N.Y. Insurance Department to stop writing new policies and to "suspend paying any and all claims" against existing policies.

LSED commenced this action in the U.S. District Court for the Eastern District of Louisiana against FGIC.  LSED  also sued Merrill Lynch, alleging that Merrill Lynch failed to disclose that the success of the proposed bond structure depended on Merrill Lynch's submitting support bids in every auction for the thirty-year life of the bonds.  LSED's action eventually was

3

transferred to the Southern District of New York by the Judicial Panel on Multidistrict Litigation along with four other actions. *See In re Merrill Lynch & Co. Auction Rate Sec. (ARS) Mkg. Litig.*, 626 F. Supp. 2d 1331 (J.P.M.L. 2009). FGIC moved to dismiss the claims against it for failure to state a cause of action, a motion the district court granted on May 11, 2010. *In re Merrill Lynch Auction Rate Sec. Litig.*, Docket Nos. 09-2030, 5404, 09-6770, 2010 WL 1924719, at *14 (S.D.N.Y. May 11, 2010). This appeal followed.[1]

## DISCUSSION

We review the grant of a motion to dismiss for failure to state a claim de novo. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). "We consider the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor." *Id.* We apply a plausibility standard in determining if plaintiff states a complaint for which relief may be granted. *Id.* at 72. Our plausibility analysis is

> guided by two working principles. First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions," and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Id.* (internal quotation marks, citations omitted; omission in the original).

---

[1] FGIC is currently operating under an Order of Rehabilitation, issued by the Supreme Court of the State of New York on June 28, 2012, available at http://www.fgicrehabilitation.com/pdflib/FGIC_Order_of_Rehabilitation.pdf. Both parties, in supplemental briefing, asserted that the order did not bar this Court from issuing a decision because the appeal was fully submitted and argued before the Rehabilitation Order issued. We agree.

4

The parties agree that Louisiana law governs the analysis. *In re Merrill Lynch*, 2010 WL 1924719, at * 4. Louisiana is a civil law state, and analyzes cases under a different methodology than common law states:

> Under Louisiana's Civil Law tradition, courts look first and foremost to statutory law. The Louisiana Civil Code instructs that '[t]he sources of law are legislation and custom,' and that '[l]egislation is a solemn expression of legislative will.' '[T]he primary basis of law for a civilian is legislation, and not (as in the common law) a great body of tradition in the form of prior decisions of the courts.' The concept of *stare decisis* is foreign to the Civil Law, including Louisiana. Therefore, in cases such as this we are guided by decisions rendered by the Louisiana appellate courts, particularly when numerous decisions are in accord on a given issue - the so-called *jurisprudence constant* - but we are not strictly bound by them.

*Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992) (footnote omitted).

## I.     Failure of cause.

The primary issue on this appeal is whether LSED may rescind the bond insurance policy for failure of cause. Louisiana's Civil Code requires that all contracts be supported by cause --- "the reason why a party obligates himself." La. Civ. Code. Ann. art. 1966, 1967. "Cause" is a more expansive concept than consideration, because:

> [u]nlike the common law analysis of a contract using consideration, which requires something in exchange, the civil law concept of 'cause' can obligate a person by his will only. The difference has been analogized to a civilian contract-consent approach compared to a common law contract-bargain approach. Consideration is an objective element required to form a contract, whereas cause is a more subjective element that goes to the intentions of the parties. Therefore, in Louisiana law, a person can be obligated by both a gratuitous or onerous contract.

*Aaron & Turner, L.L.C. v. Perret*, 22 So. 3d 910, 915 (La. App. 1st Cir. 2009).

5

Louisiana law recognizes at least two grounds for failure of cause. "Error can vitiate consent, so that a contract may be rescinded based upon an error." *Cyprien v. Bd. of Supervisors el rel. Univ. of La.*, 5 So. 3d 862, 868 (La. 2009). But "[e]rror vitiates consent only when it concerns a cause without which the obligation would not have been incurred, and that cause was known or should have been known to the other party." La. Civ. Code art. 1949. Cause may also fail when circumstances change, even if the changes are created by the acts of third parties. *Carpenter v. Williams*, 428 So. 2d 1314, 1318 (La. App. 3d Cir. 1983) ("[t]he parties entered into a contract assuming certain facts or conditions to exist. When the assumed fact or condition was found not to exist or did not come into existence even through the act of third parties [], the contracts have been rescinded."). Thus, under Louisiana law, a failure of cause that occurs after an agreement is entered into provides a basis for rescission, so long as that cause was known to the other party.

While "[c]ause is the reason why a party obligates" itself, *St. Charles Ventures, LLC v. Albertsons, Inc.*, 265 F. Supp. 2d 682, 687 (E.D. La. 2003), a party may also have "motive" to enter into an agreement. "Motive relates to a party's internal, subjective reasons for entering a contract, which cannot be imputed to the knowledge of the other party." *Bluebonnet Hotel Venture LLC v. Wachovia Bank, N.A.*, No. 10-cv-489 (E.D. La. Sept. 29, 2011). Unlike cause, an error as to a party's motive does not provide a ground for rescission of an agreement. *St. Charles Ventures*, 265 F. Supp. 2d at 692 (collecting cases discussing actionable cause and inactionable motive). A failure of cause is therefore a viable ground for rescission, but a failure of motive is not.

6

*Cyprien* is particularly instructive on the issue of failure of cause. There, plaintiff applied for a job as head coach of the University of Louisiana at Lafayette ("ULL") basketball team. *Cyprien*, 5 So. 3d at 864. Plaintiff had a student worker at his former university fax a copy of plaintiff's resume to ULL. *Id.* According to the resume, plaintiff had graduated from the University of Texas at San Antonio ("UTSA") with a bachelor's degree, which was false. *Id.* After ULL hired plaintiff, a newspaper revealed that plaintiff never graduated from UTSA. *Id.* ULL fired plaintiff the same day the article appeared, and plaintiff sued for breach of contract. *Id.*

The Louisiana Supreme Court determined that ULL properly rescinded the contract based on failure of cause. *Id.* at 867-68. After considering affidavits from university officials stating that (1) a degree from an accredited four-year university was a job requirement; and (2) ULL would not have hired Cyprien if it knew he did not have a degree from UTSA, the court granted summary judgment to the university, finding:

> These affidavits establish that ULL would not have incurred the obligation if it had known that Mr. Cyprien did not have a degree from an accredited university. Mr. Cyprien clearly knew or should have known that his academic qualifications were an important factor in ULL's decision to hire him. Under these circumstances, we find ULL has established that it had a valid ground to rescind Mr. Cyprien's contract based on error in the cause. Thus, Mr. Cyprien will be unable to establish a bad faith breach of contract claim. The district court erred in denying ULL's motion for summary judgment on this claim.

5 So. 3d at 868.

Finally, the error in cause must be reasonable to support a claim under Louisiana law. *See Quality Design and Constr., Inc. v. Capital Glass Co.*, 2008 WL 4764341, at *4 (La. App. 1st Cir. Oct. 31, 2008) ("unilateral error . . . does not vitiate consent if the reason for the error

7

was the complaining party's own inexcusable neglect in discovery of the error"); *Degravelles v. Hampton*, 652 So.2d 647, 649 (La. App. 1st Cir. 1995) ("[a] contract may be invalidated for unilateral error as to a fact which was a principal cause for making the contract, but only when the other party knew or should have known it was a principal cause").

LSED argues that at the time it purchased the bond insurance, FGIC falsely represented that it invested conservatively, was creditworthy, and would take steps to maintain its creditworthiness going forward, and that the district court erred in finding this did not provide it with a viable cause of action under Louisiana law. **(Blue 27)** We agree with the district court's analysis.

The commitment letters entered into between the parties referenced the "Official Statement Disclosure Language," which LSED was required to include in the Bonds. The disclosure language stated that FGIC's triple-A ratings reflected the "ratings agencies' current assessments of the insurance financial strength of [FGIC] . . . . These ratings are not recommendations to buy, sell or hold the Insured Bonds, and are subject to revision or withdrawal at any time by the rating agencies." The disclosure language also explicitly stated that the Policies did "not insure any risk other than Nonpayment by the Issuer." Plainly, LSED was aware that (1) there were no guarantees attached to FGIC's credit rating over the life of the Bonds and (2) the Bonds' only intended purpose was to insure the bondholders against the risk of nonpayment by LSED.

This case turns on what LSED purchased from FGIC. As the disclosure language makes clear, LSED purchased bond insurance, not credit enhancement. The distinction is critical. LSED argues that the failure of cause was not FGIC's inability to maintain a guaranteed triple-A

8

rating, but FGIC's failure to operate its business in a careful and prudent manner. The problem with LSED's argument is that it cannot sue based on a failure to pay out on the bonds, because it is undisputed that no bonds were ever presented for payment. Even if a failure to pay occurred, it is not clear that LSED would have standing to press that claim, which would appear to belong to the bondholders in the first instance. That leaves lack of credit enhancement as LSED's only harm, and while credit enhancement may have been a hoped for benefit of the bonds, it cannot be said to be their primary cause.

LSED's failure to receive the hoped-for credit enhancement is a failure of motive, not a failure of cause. Indeed, every court to have considered the issue has found that absent an express contractual obligation, bond insurance policies cannot form the basis for a claim based on an insurer's ruined credit rating. *See Ambac Assurance Corp. v. Adelanto Pub. Util. Auth.*, No. 09 Civ. 5087(JFK), 2011 WL 5553444, at * 6 (S.D.N.Y. Nov. 14, 2011) ("Regardless of the Authority's subjective motivations for purchasing the insurance policies offered by Ambac, Ambac never assumed a contractual duty to maintain a certain credit rating or to engage in any conduct other than to make the promised payments pursuant to the Bond Insurance Policies and the Surety Bond."); *Water Works Bd. of City of Birmingham v. Ambac Fin. Group, Inc.*, 718 F. Supp. 2d 1317, 1320 (N.D. Ala. 2010) ("It would defy logic and common sense for Ambac to obligate itself to maintain for thirty-five (35) years the highest possible credit rating, when the determination and the award of credit ratings are by separate entities"); *NPS, LLC v. Ambac Assur. Corp.*, 706 F. Supp. 2d 162, 177 (D. Mass. 2010) ("characterizing [lower interest rates] as a 'principal' purpose of the Agreement runs counter to the contractual document itself as well as to the nature of the contractual relationship between the parties"); *see also* Transcript of Oral

9

Argument at 41, *City of New Orleans v. Ambac Assurance Corp.* (E.D. La. Oct. 14, 2010) 08-3949  (applying Louisiana law to find that "here obtaining the credit enhancement that came with AAC's financial guarantee was the advantage of entering into the Agreement but characterizing the receipt of these benefits as a principal purpose of the Agreement runs counter to the contractual document itself which does not guarantee credit enhancement over the period of time").

The Fifth Circuit's recent decision in *Dameware Development, L.L.C. v. American General Life Insurance Co.*, 688 F.3d 203 (5th Cir. 2012), illustrates these concepts.  There, a pension plan purchased life insurance policies, then sued the insurance company after the purchase failed to yield the tax benefits the pension plan had hoped for.  Specifically, the pension plan intended to use the insurance policies "to establish a pension plan that qualified for favorable tax treatment pursuant to section 412 of the Internal Revenue Code." *Id.* at 205.  The pension plan argued, in part, that its contract with the insurance company was rendered invalid by an error concerning cause. *Id.* at 207.   The Fifth Circuit, applying Louisiana law, turned to the language of the contract at issue in finding there was no error of cause.  It noted that the agreements between the parties "disclaim[] any responsibility on the part of the" insurer for creating a 412(I) Plan; and also contained a list of providers who could create such a plan, and that whichever provided chosen by the pension plan would be "solely responsible" for establishing a 412(I) Plan. *Id.*  Thus, the Fifth Circuit concluded, the language of the agreement between the pension plan and the insurer "demonstrates that 'the reason [the pension plan] obligated itself' in its contract with [the insurer] was to secure life insurance policies for its employees." *Id.*  Similarly, here the agreements make clear that (1) LSED was purchasing bond

10

insurance, and nothing more; and (2) FGIC made no representations or promises to maintain its credit rating over the life of the bonds.

We find nothing in Louisiana law that would allow a party to recover damages based on a belief that certain conditions would be maintained by the other party when the contract explicitly disclaimed any guarantee of a continuance of those conditions. The underlying transaction here is similar to buying title insurance when obtaining a mortgage to buy a house. The mortgagor buys a title insurance policy that provides coverage to the bank as mortgagee. The fact the mortgagor pays a lower interest rate, or even that the title insurance entices the bank to make the loan, is the benefit the mortgagor receives from purchasing the policy. But the purpose of the policy itself is to provide the bank with insurance in case title turns out to be flawed. The contract is fulfilled when the premium is paid and the insurer agrees to pay if the title is later found flawed. The only breach is if the insurer refuses to pay in accordance with the terms of the policy.

On a much grander scale, that is what happened here. LSED bought bond insurance from FGIC. The purpose of buying the bond insurance was to protect the bondholders in event of a default by LSED. A side benefit may have been a lower interest rate — credit enhancement — but it was not part of the contract. The contract is explicit that it protects only the bondholders, and that there is no guarantee that FGIC will maintain any particular credit rating.

Further, there is a line of Louisiana cases indicating that a party's "error in judgment founded upon its own evaluation of future market conditions" does not permit rescission based on an error of cause. *Hanover Petroleum Corp. v. Tenneco Inc.*, 521 So. 2d 1234, 1240 (La. App. 3d Cir. 1988). In *Hanover*, defendant sought to rescind a contract on the ground of error of

11

cause - specifically "the unforeseen collapse of the natural gas market and governmental restructuring of the industry," which "rendered its performance under the contract untenable." *Id.* The state court refused, finding defendant's claim of error was simply based on its own error in judgment. *Id.*; *see also Esplanade Oil & Gas Inc. v. Templeton Energy Income Corp.*, 889 F.2d 621, 625 (5th Cir. 1989) (rejecting the assertion that the principal cause of the agreement was to obtain an "income stream," which had failed as a result of the plunge in the market price of oil and noting that the contract language did not provide for the purchase of an income stream); *Superior Oil Co. v. Transco Energy Co.*, 616 F. Supp. 98, 109 (W.D. La. 1985) (holding that the fact that the "market has simply not evolved in the manner anticipated" is not error in the principal cause of the contract).

The facts here are similar. LSED argues that had it known FGIC would act to denigrate its own credit rating, it would never have paid the $13 million premium up front. However, as detailed above, the commitment letters specifically disclaimed any guarantee to maintain a AAA-credit rating agency. This explicit disclaimer language - of which LSED was well aware - placed LSED on notice of the possibility that FGIC's credit rating would be reduced in the future. LSED took a calculated commercial risk that did not perform as it hoped. Even under Louisiana's civil law, it is not the role of this court to relieve LSED of its bad bargain.

## II.     Implied breach of contract.

For the same reasons, LSED fails to state a viable claim for a breach of an implied obligation. Article 2054 of Louisiana's Civil Code provides:

> When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.

12

By its very nature, Article 2054 is a gapfiller, used to infer obligations into a contract only "[w]hen the parties made no provision for a particular situation." No such gapfiller is necessary here. The one obligation FGIC assumed was the obligation to pay on the bonds in the event of a default by LSED. In the absence of a default, that obligation does not come due. Moreover, the failure to pay on a properly presented bond would be a breach of an explicit obligation, not an implied obligation.

The Third Amended Complaint cannot be fairly read as creating an issue as to whether "the need to maintain a credit rating of any kind" was an implied contractual obligation. LSED pleaded that "to fulfill its obligation to provide credit enhancement, FGIC needed to issue LSED an insurance policy . . . and maintain its 'triple-A' rating over the 30-year life of the Bonds." *See* A290, ¶ 293; *see also* A153, ¶ 78 ("[i]f FGIC's credit rating fell below triple-A at any time after the Bonds were issued, LSED - not investors holding the Bonds - would bear the cost in the form of higher interest rates"); A230, ¶ 294 ("LSED was paying for FGIC's triple-A rating"); *id.* at ¶ 296 ("FGIC knew that LSED was relying on FGIC's credit enhancement - accomplished through FGIC's maintaining its 'triple-A' rating . . . for the life of the Bonds"); A231, ¶ 297 ("FGIC's loss of its 'triple-A' rating . . ."). While LSED argues that "[t]his case is not simply about FGIC's credit rating," that argument loses its force when one reads the pleadings. The pleadings identify FGIC's breach as the loss of "its 'triple-A' credit rating." The Commitment Letters explicitly disclaim any obligation to maintain a credit rating, and no reading of Louisiana law allows us to imply into a contract an obligation that the parties explicitly rejected.

### III. Anticipatory breach of contract.

LSED also argues that FGIC anticipatorily breached its contract by rendering itself unable to pay claims. Under Louisiana law, the doctrine of anticipatory breach "applies when an

13

obligor announces he will not perform an obligation which is due sometime in the future. The obligee need not wait until the obligor fails to perform for the contract to be considered in breach." *Gulf Coast Bank & Trust Co. v. Rick Granger Enters.,* 800 So. 2d 402, 404-05 (La. App. 3d Cir. 2001) (quotation marks and citation omitted). Here, LSED argues FGIC explicitly agreed to guarantee payment. But by order of the N.Y. Insurance Department, FGIC cannot pay claims. Thus, LSED argues, FGIC is in breach of contract.

FGIC counters that LSED lacks standing to press this claim, because LSED is not a bondholder. The contract between the parties required only that FGIC issue the policies, and once FGIC did, it argues, all of its obligations to LSED ended. Any future obligations are only to the bondholders, not LSED. *See* A349, "As used herein, the term 'Bondholder' means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof." Thus, because LSED's rights are not affected by any breach of the Policies, either now or in the future, FGIC argues it cannot be found to have anticipatorily breached the policies.

The district court declined to reach the issue of whether LSED had standing, instead finding that because FGIC did not yet expressly renounce its obligations under the contract, there is no anticipatory breach. We agree. Louisiana law requires "a definitive refusal to perform" before a claim for anticipatory breach can stand. *Andrew Dev. Corp. v. West Esplande Corp.*, 347 So. 2d 210, 213 (La. 1977). While FGIC cannot now pay out on any claims because of the Insurance Department order, as made clear at oral argument, that does not mean it could not pay out on such claims in the future. The district court correctly dismissed the breach of contract claim.

**IV.     Detrimental reliance.**

The Louisiana Code permits a party to state a claim for detrimental reliance:

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

La. Civ. Code Ann. art. 1967. A plaintiff alleging detrimental reliance must establish (1) a representation by conduct or word, (2) justifiable reliance on the representation, and (3) a detrimental change in position because of the reliance. *Babkow v. Morris Bart, P.L.C.*, 726 So. 2d 423, 427 (La. App. 4th Cir. 1998).  The district court found that "[t]he clarity with which the Commitment Letters disclosed that FGIC's credit rating was subject to change compels the conclusion that LSED cannot benefit from the theory of detrimental reliance."  *In re Merrill Lynch*, 2010 WL 1924719, at *14.

The district court relied on *Drs. Bethea, Moustoukas and Weaver LLC v. St. Paul Guardian Ins. Co.*, 376 F.3d 399 (5th Cir. 2004).  Plaintiffs were former policyholders of a medical malpractice policy that provided for free tail coverage for any policyholder who retired.  The insurer decided to leave the medical malpractice market.  Plaintiffs sued, alleging that the insurer reneged on its promise to provide free tail coverage upon retirement by leaving the market before the plaintiffs retired.  *Id.* at 402.  Plaintiffs relied on a letter explaining changes to the policy, and on a brochure, to support their position.  The insurer argued that the policy was clear that free tail coverage would be provided under certain limited circumstances (the relevant one here being retirement during the policy's coverage period), making any reliance on extra-

15

contractual promises unreasonable.  *Id.*  The Fifth Circuit held that Louisiana law allows courts to find a plaintiff's reliance on a promise unreasonable as a matter of law where the contract at issue is unambiguous.  *Id.* at 403-04.  The Fifth Circuit held that:

> We find no error in the district court's dismissal. Bethea's allegation of reasonable reliance on the O'Brien letter and St. Paul's brochures as a promise that St. Paul would provide unconditional free tail coverage, or at least that St. Paul would renew Bethea's policy until the doctors could take advantage of the free tail coverage, is belied by the clarity of the insurance policy and the content of the documents at issue. The insurance policy, which is indisputably valid and not breached, provides that either party may non-renew at any time and that tail coverage will be provided for no additional premium only upon retirement during the policy's term. Both the contract's integration clause and Louisiana law require that any change to the policy be in written form and incorporated into the policy. One could not reasonably rely on a renewal letter explaining policy changes and marketing brochures as a promise to provide free tail coverage without limit, especially considering that such a promise is not mentioned in the documents and would directly conflict with the policy. Given that the insurance policy unambiguously defines the parties' rights and limits the way to alter the policy, it was unreasonable to rely on informal documents as modifying material aspects of the policy.

*Id.* at 404-05 (footnote omitted).

LSED argues that the Commitment Letters do not reflect a complete and unambiguous agreement because certain terms (including the pricing) were not included in the contract. Further, LSED argues, the contract here does not include an integration clause, while the contract in *Bethea* did, again making it distinguishable.   FGIC argues that detrimental reliance usually only comes into play when there is no written contract, or when the contract is unenforceable.  *Jackson v. Lare*, 779 So. 2d 808, 814 n.1 (La. App. 2d Cir. 2002).

The district court correctly concluded the contract at issue here was unambiguous.  The issue of the missing integration clause is not particularly relevant to our analysis.  The

integration clause was important in *Bethea* because the plaintiffs were arguing other documents changed the terms of the insurance policy. Under Louisiana law, "[p]arol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous." *Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2000). "A contract is considered ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed." *Id.* Looking at the term at issue, the Commitment Letters are plainly unambiguous on the issue before us. The Commitment Letters make clear that FGIC did not guarantee that it would remain a triple-A rated entity for the life of the Bonds. Because the Letters are unambiguous and clear on this point, any reliance on statements made in FGIC's marketing materials (which were not part of the agreement between the parties) is, as a matter of law, unreasonable.

## CONCLUSION

We have examined the remainder of LSED's arguments and find them to be without merit for the reasons set forth in the district court's carefully considered opinion. The decision of the district court is affirmed in all respects.

17

Hall, Circuit Judge, dissenting:

Louisiana Stadium and Expositions District ("LSED") argues on appeal that the district court improperly dismissed for failure to state a claim under Louisiana law LSED's four claims against Financial Guaranty Insurance Company ("FGIC")—failure of cause, breach of an implied obligation, detrimental reliance, and unjust enrichment. Although I would hold that LSED has adequately and plausibly pleaded the above claims so as to survive a motion to dismiss under Rule 12(b)(6) of federal procedure, our *de novo* review requires us to interpret several provisions of the Louisiana Civil Code which, having undergone a revision in 1984, lack sufficient clarity for common law jurists to render an authoritative answer on the adequacy of the pleadings in this case. Thus, for reasons that follow, I cannot join the majority opinion, and I would vacate the judgment of the district court or, preferably, certify the following question to the Louisiana Supreme Court:

> Under the Louisiana Civil Code, has the plaintiff LSED adequately pleaded causes of action for failure of cause and breach of implied obligation with respect to the bond insurance policies purchased from FGIC such that if the relevant obligations were proven at trial, LSED would be entitled to rescind the obligation?[1]

Although certification should be done "sparingly" and not "merely because state law permits its use," *Runner v. N.Y. Stock Exchange, Inc.*, 568 F.3d 383, 388 (2d Cir. 1999), this case presents a prime opportunity for the Louisiana Supreme Court to clear up post-revision confusion and give direction to federal and state courts grappling with claims unique to Louisiana civil law.[2] Whether this Court asks a state court to "resolve unsettled legal questions"

---

[1] The Louisiana Supreme Court could reformulate or expand upon this question as it sees fit, based on the record in this case.

[2] Louisiana law and our own local rules permit us to certify "questions or propositions of [Louisiana law] to the Supreme Court of Louisiana for rendition or a judgment or opinion concerning certain questions or propositions of Louisiana law" in a case where it appears that there are "questions or propositions of law of [Louisiana] which are determinative of said cause independently of any other questions involved in said cause and that there are no clear

1

depends principally on "(1) the absence of authoritative state court decisions; (2) the importance of the issue to the state; and (3) the capacity of certification to resolve the litigation." *O'Mara v. Town of Wappinger*, 485 F.3d 693, 698 (2d Cir. 2007); *see also Reliance Ins. Co. v. Polyvision Corp.*, 474 F.3d 54, 58 (2d Cir. 2007). Considering these factors, certification is clearly warranted here. Louisiana no doubt has a compelling need to ensure that its civil law of obligations is appropriately treated by federal courts and its own state courts, and the Louisiana Supreme Court is in the best position to resolve this litigation and bring clarity to its underlying legal questions. Most importantly, however, there appears to be a marked absence of clear authority on the proper analysis of failure of cause and breach of implied obligation claims, and there are too many inherent difficulties in common law-trained jurists predicting resolutions of these unsettled areas of Louisiana civil law.

Louisiana courts, too, have struggled with the distinction between actionable failure of cause claims and non-actionable failure of motive claims. Since the disappearance of the word "motive" from the Louisiana Civil Code's provisions regarding "failure of cause" claims, state courts in Louisiana have been unsure about the role "failure of motive" can play in a "failure of cause" claim. *See, e.g.*, *Hanover Petroleum Corp. v. Tenneco, Inc.*, 521 So. 2d 1234, 1240 (La. App. Ct. 1988) (stating, in error, that Louisiana Civil Code articles 1948 and 1949 provide that "consent may be vitiated by error only when it concerns the principal cause or motive and that cause or motive was known or should have been known to the other party"). To date, the clearest discussion regarding the distinction between "failure of cause" and "failure of motive" has come from the United States District Court for the Eastern District of Louisiana in *St.*

---

controlling precedents in the decisions of the [Supreme Court of Louisiana]." Rule XII, § 1, Rules of Sup. Ct. of La. *See also* 2d Cir. L.R. 27.2(a) ("If state law permits, the court may certify a question of state law to that state's highest court. When the court certifies a question, the court retains jurisdiction pending the state court's response to the certified question.").

*Charles Ventures, LLC v. Albertson's Inc.*, 265 F. Supp. 2d 682 (E.D. La. 2003). Even there, though, the court noted a possible "anomaly," an allegedly outlying Louisiana appeals court case in which "the court may have treated as 'cause' that which was more properly considered a motive." *Id.* at 691.

The status of breach of implied obligation causes of action is also unclear, especially as to when an obligation may be implied. Article 2054 of the Louisiana Civil Code provides that "[w]hen the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose." The Louisiana Supreme Court, interpreting the predecessor statute to article 2054, stated that this language stands for two propositions. First, because "not all obligations arising out of contract need be explicitly stated . . . good faith performance is implied." *National Safe Corp. v. Benedict & Myrick, Inc.,* 371 So. 2d 792, 795 (La. 1979). Second, and more importantly, equity will supply "everything" that is "considered incidental to the particular contract, or necessary to carry it into effect" in "incidents only as the parties may reasonably be supposed to have been silent upon from a knowledge that they would be supplied from that [equity]." *Id.* Equity, being "founded in the christian principle not to do unto others that which we would not wish others should do unto us," *id.*, resulted in a breach of implied obligation in *National Safe* because if the "contracting parties were reversed [the defendant] would not expect to be treated as it treated [the plaintiff]." *Id.* at 795. While I am certain that FGIC would not wish to be treated as it treated LSED, the Louisiana Supreme Court has not elaborated on the scope of equity required by the successor statute, Article 2054, at issue here. Indeed, federal and state courts interpreting the provision remain conflicted. Some note or rely

3

on the "christian principle." *See, e.g.*, *Devin Tool & Supply Co. v. Cameron Iron Works, Inc.*, 784 F.2d 623, 627 n. 2 (5th Cir. 1986) (per curiam); *Owl Constr. Co. v. Ronald Adams Contractor, Inc.*, 642 F. Supp. 475, 479 (E.D. La. 1986); *Morphy, Makofsky & Masson v. Canal Place 2000*, 538 So. 2d 569, 574 n.8 (La. 1989); *Gibbs Constr. Co. v. Thomas*, 500 So.2d 764, 767 (La. 1987). Others narrow it to a ban on unjust enrichment or jettison it altogether. *See Hendricks v. Acadiana Profile, Inc.*, 484 So. 2d 242, 245-46 (La. Ct. App. 1986) (suggesting the principle is a simple ban on unjust enrichment); *see also Am. Bank & Trust of Coushatta v. FDIC*, 49 F.3d 1064, 1067-68 (5th Cir. 1995) (predicting *National Safe* is an "anomaly" that "the Louisiana Supreme Court would not choose to apply" again). Unlike the Fifth Circuit in *Am. Bank & Trust of Coushatta* or my colleagues, who call article 2054 a simple "gapfiller," I believe a question as important as the scope of equity giving rise to implied obligations in contracts in the state of Louisiana should be resolved by the Louisiana Supreme Court itself.

Given the "anomalous" state of case law on failure of cause and breach of implied covenant claims, I reject the majority's implicit conclusion that LSED's claims are easy to resolve on the face of the complaint as a matter of law. The majority, as the district court did, ignores the unique characteristics of the issues presented and advances an unsound analysis—even relying on precedent of common law jurisdictions—in its attempt to resolve questions specific to Louisiana civil law. **[*See* Maj. Op. at 8–9.]** Moreover, as it stands now, the majority's and the district court's reasoning, which I believe is faulty, only perpetuates confusion over Louisiana's unique failure of cause and breach of implied obligation claims. *See also City of New Orleans v. Ambac Assurance Corp.*, No. 08-3949 (E.D. La. 2010). I am mindful that this Court's task is to predict how the Louisiana Supreme Court would resolve the case before us, and frankly, were I forced to do so, I would vacate the decision below and permit LSED's claims

4

to proceed.  My analysis of Louisiana law and the rationale suggesting certification of these two principal issues follows.

I.	Failure of Cause

The majority overlooks several errors made by the district court in dismissing LSED's failure of cause claim in this case.  First, the district court incorrectly determined that Louisiana law has a presumption against failure of cause claims where "the error concerns an event that is expected to take place in the future," i.e., where the error asserted is with respect to events occurring after the formation of the contract. *In re Merrill Lynch Auction Rate Sec. ("ARS") Litig.*, No. 09 MD 2030, 2010 WL 1924719, at *6 (S.D.N.Y. May 11, 2010).  Second, the district court prematurely attributed LSED's ignorance of FGIC's business practices at the time it acquired the bond insurance to "inexcusable ignorance, neglect, and want of care."   Lastly, in its analysis of LSED's failure of cause claim, the district court failed to appreciate fully the nuanced difference between a claim for failure of motive and one for failure of cause.  The majority opinion only compounds these errors.

A.	LSED's Failure of Cause Claim

LSED's failure of cause claim, viewed in the light most favorable to LSED, is best characterized as follows: FGIC purported to provide credit enhancement that LSED needed to offset its poor credit.  This credit enhancement, in the form of bond insurance, would signal to the market that LSED's bond had less risk of non-payment, thus reducing the bond's interest rates and lowering LSED's overall costs of the bond issue.  Given FGIC's representations, LSED reasonably expected that FGIC would maintain creditworthiness by doing business in its typical conservative remote-loss manner so that the market would reward its FGIC-insured bonds with more favorable interest rates.  The error of fact bearing on the issue of cause is that, at the time it

5

contracted with LSED or shortly thereafter, FGIC was knowingly engaging in risky deals that seriously jeopardized its creditworthiness. Because bond insurance is only as good as the creditworthiness of the insurer, viewed in the light most favorable to LSED, arguably an error in fact as to the principal cause occurred because FGIC was not conducting its business in the conservative, remote-loss manner that LSED was led to believe it would. Had LSED known about FGIC's risky business practices at the time it entered the obligation and acquired bond insurance, those practices would have thrown the suitability of FGIC's bond insurance into question, and LSED would not have paid FGIC $13 million for that insurance.

The majority does not see it this way. Drawing on language from a disclaimer related only to FGIC's AAA rating, not its general creditworthiness, the majority concludes that there "were no guarantees attached to FGIC's credit rating" and that the policies' "only intended purpose was to insure the bondholders against the risk of nonpayment by LSED." [*See* **Maj. Op. at 8.**] This, the majority believes, shows that LSED could therefore not have been purchasing credit enhancement as its "primary cause." Despite allegations and record support to the contrary, and armed only with precedent relying on common law contract interpretations, the majority then classifies LSED's "failure to receive the hoped-for credit enhancement" as a non-cognizable "failure of motive." *See* Maj Op. at 9.

Further illustrating the confusion, the majority then likens bond insurance to title insurance and suggests such an analogy forecloses LSED's claim under Louisiana law. My colleagues observe that title insurance primarily insures against risk of flawed title and only incidentally allows a mortgagee to benefit in the form of a lower interest rate charged by the bank. I do not quarrel with the conclusion, based on the hypothetical, that the "only breach is if the insurer refuses to pay in accordance with the terms of the policy." [*See* **Maj. Op. at 9–10.**]

6

Based on my understanding of Louisiana's action for failure of cause, however, I cannot agree with my colleagues that rescission is inappropriate simply because FGIC has not yet breached the strict terms of the policies.

An "obligation"—Louisiana's civil law equivalent of a contract—"cannot exist without a lawful cause." La. Civ. Code art. 1966. "*Cause* is the reason why a party obligates himself." *Id.* art. 1967 (emphasis added). "[T]he civil law concept of 'cause' can obligate a person by his will only, [u]nlike the common law analysis of a contract using consideration." *Aaron & Turner, L.L.C. v. Perret*, 22 So. 3d 910, 915 (La. Ct. App. 2009). This willful "consent" to an obligation "may be vitiated by *error*, fraud or duress." La. Civ. Code art. 1948 (emphasis added). Consent will be vitiated by error when "it concerns a *cause* without which the obligation would not have been incurred and that cause was known or should have been known to the other party." La. Civ. Code art. 1949 (emphasis added). Error will concern a cause "when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or qualities of the other party, or the law, *or any other circumstances that the parties regarded, or should in good faith have regarded, as a cause of the obligation.*" *Id.* art. 1950 (emphasis added); *see also Cyprien v. Bd. of Supervisors for the Univ. of La. Sys.*, 5 So. 3d 862, 868 (La. 2009) (discussing failure of cause under the Louisiana Civil Code). Because "cause" is broad enough to encompass reasons a party *should have* regarded as the cause, in my view it is impossible for the express contract always to contain the primary cause or causes for why a party obligated itself.

The majority opinion searches the contract documents, which the district court noted were "not entirely clear," *In re Merrill Lynch ARS Litig.*, 2010 WL 1924719, at *4 n.2, for what it identifies as LSED's "primary" cause, bond insurance. This proposition, dubious as it is,

7

implicitly misstates Louisiana law.  Although an actionable failure of cause claim requires the cause pleaded to be a "principal" one, the 1984 revisers removed the word "principal" because it invites confusion.  This confusion, which seemingly controls the majority's rationale, suggests that a party is limited to *one* "primary" cause.  Louisiana law, however, flatly rejects this approach:  "Even when an obligation has multiple causes, error that bears on any one of them is sufficient to make the obligation invalid."  *See St. Charles Ventures*, 265 F. Supp. 2d, 682, 689 (quoting La. Civ. Code art 1949, rev. cmts. 1984(e)) (discussing the evolution of the failure of cause action and basis for revision).  Indeed, even the Louisiana statutes use the words "a cause," La. Civ. Code art. 1949, and "any other circumstances," *id.* art. 1950, that the parties did regard or should have regarded as a cause of the obligation.  So, even if bond insurance were a "cause," the authorities cited above clearly suggest that LSED is not limited to only *one* actionable form of cause.

Instead, "a line of cases where error as to cause has been recognized and contracts rescinded" often "concern error with respect to the nature of the thing sold and its suitability for its intended use."  *See St. Charles Ventures*, 265 F. Supp. 2d at 689–91 (discussing pre- and post-code revision cases to support the idea that failure of cause involves the "suitability of the thing purchased in relation to the reason or cause of the purchaser so doing").  Without recognizing the breadth of LSED's claim for failure of cause, the majority's rationale upholding the dismissal of that claim latches onto a small component of it—FGIC's failure to maintain its AAA rating—and on this thin reed concludes as a matter of law that LSED's cause could not have been credit enhancement.  The problem with the majority's reasoning, however, is that LSED's cause—credit enhancement—the overarching purpose for which FGIC's bonds were believed to suitable,

8

is not synonymous with a AAA guarantee. There are related problems with the majority's analysis, as well.

First, it seems to me that the majority does not clearly recognize LSED's real complaint, to wit, FGIC knowingly embarked on a reckless course of guaranteeing assets without regard for their integrity or risk. That the ratings agencies downgraded FGIC based on this behavior is arguably true, but this does not change the fact that LSED bought FGIC's policies based on a good faith belief—if false premise—that FGIC would remain a creditworthy enterprise. To focus on the actions of third parties, the ratings agencies, without discussing the allegations that FGIC knew parties such as LSED relied on its *general* creditworthiness when buying insurance is viewing the complaint in the light least favorable to LSED, not the most.

Again, the majority opinion also mistakenly relies on FGIC's disclaimer to wash away the numerous instances in the complaint in which FGIC, without reference to its AAA rating, represented itself as providing credit enhancement. *See* Third Am. Compl. ¶¶ 83, 85 ("Our long-term goal is to continue to maintain a low risk book . . ."); *id.* ¶ 88 (purchasing bond insurance will "lower cost of funds" to LSED). The majority thus cannot seriously contend that the limited disclaimer as to the AAA rating also disavowed FGIC's broader obligation to remain a company that can pay claims or appear to be a company that can pay claims. Certainly the obligation of an insurance company to refrain from driving itself off a cliff need not be found in the express terms of the contract, especially when it makes contrary pre-obligation representations. I am not satisfied, therefore, to determine as a matter of law that FGIC did not knowingly and carelessly endanger its purported conservative investment practices.

The majority cites the Fifth Circuit's recent decision in *Dameware Dev., L.L.C. v. Am. Gen. Life Ins. Co.*, 688 F.3d 203 (5th Cir. 2012) as support for the proposition that FGIC's

9

disclaimer of any guarantee that FGIC's bonds will maintain an AAA rating is sufficient to defeat LSED's claim for failure of cause. **[Maj. Op at 11–12.]** To the contrary, however, when examined in light of the clear differences between the disclaimer and representations in *Dameware* and those in this case, viewed through the lens of the respective complaints' claims for failure of cause, the negative inference drawn from *Dameware* in fact demonstrates that FGIC's disclaimer cannot defeat LSED's claim for failure of cause as pleaded.

In *Dameware* a pension plan purchased life insurance policies with the understanding that those policies would yield certain tax benefits. When the pension plan did not receive the favorable tax treatment it had intended to acquire, it sued for rescission of its purchase based on failure of cause. *Id.* at 205. The Fifth Circuit, however, held that there was no failure of cause, noting that the life insurer expressly disclaimed any "tax consequences and/or planning concepts" that it may have used in "describing the benefits of using life insurance in connection" with the policy. *Id.* at 206. In *Dameware*, the disclaimer and party representations were in fact comprehensive, showing that the parties "acknowledged that they understand" that the life insurer "operates solely in the capacity of a *product provider* and that any sales presentations" or even its description of "benefits of using life insurance in connection with [its product] cannot be relied upon as tax or legal advice." *Id.* at 210 (emphasis added). In acquiring the life insurance policies, Dameware even acknowledged that it was "not relying upon any representation, warranty, or guarantee beyond those contained within the insurance policy contract itself, including any riders or amendments thereto." *Id.*

Here, in stark contrast to the disclaimer and representations in *Dameware*, there was no express disclaimer of FGIC's explicit representations about its credit-enhancing bond insurance products, nor did FGIC specifically assert that (a) its role was solely as product provider and it

10

had no responsibility for the benefits it represented such products to have, or (b) that its conservative financial practices and stringent underwriting procedures were subject to radical change such that no customer could rely on them. Had there been in this case this sort of *Dameware*-like disclaimer, I would agree with the majority that the bases on which LSED has pleaded its claims for failure of cause would be meritless. LSED's complaint, however, sets forth these bases, and FGIC's disclaimer covers none of them. This distinction thus compels the conclusion, at this stage of the proceedings, that FGIC's disclaimer (covering only its AAA-credit rating) is totally insufficient to preclude LSED's pleaded claims for failure of cause.[3]

*Dameware* also provides further guidance on the scope of an effective disclaimer, for it demonstrates that sophisticated parties know how expressly to disclaim that which they intend. The disclaimer here relates solely to FGIC's AAA-credit rating, asserting that third-party credit-ratings agencies may modify the rating. LSED neither disputes that this limited disclaimer was made, nor does it assert, as the sole basis for failure of cause, that FGIC lost its AAA rating. But that limited disclaimer, which surely FGIC could have expanded to match the full and multifaceted scope of the disclaimer in *Dameware*, is insufficient to bar LSED's claim for failure of cause based on (1) FGIC's representations regarding the benefits of its bond insurance products, (2) FGIC's ongoing responsibility for such products, and (3) FGIC's mode of conservative fiscal management. Based on the complaint's allegations viewed in the light most favorable to the plaintiff, I must conclude that there was an error in fact affecting the suitability of FGIC's insurance policies as FGIC represented them and as LSED understood them. Given those allegations, coupled with the nature of a "cause" under Louisiana law, I am of the opinion that LSED has, at least at this stage, pleaded a plausible claim for relief for failure of cause. The

---

[3] It is worth noting that, once again, jurists contemplating what does and does not constitute failure of cause find diametrically opposed answers in the same case. Surely this exemplifies the need for the Louisiana Supreme Court to resolve the legal question before us here.

11

district court's analysis, which my colleagues adopt, displays several additional errors worthy of discussion. Failure of cause most often occurs when an error of fact exists at the time the contract (obligation) is incurred. In other words, there is a "failure of cause" where one party conceals, obfuscates, or lies about a particular fact that, had the truth been known to the other contracting party, would have stopped that other party from entering into the obligation; and so, cause may fail due to a "unilateral" error. *St. Charles Ventures, LLC v. Albertson's Inc.*, 265 F. Supp. 2d 682, 688 (E.D. La. 2003).

Contrary to the district court's suggestion that Louisiana courts "are hesitant to vitiate a contract when error concerns an event that is expected to take place in the future," *In re Merrill Lynch ARS Litig.*, 2010 WL 19424719, at *6, Louisiana courts routinely uphold failure of cause claims on the basis of changed circumstances occurring after the contract is executed. "A cause may exist at the inception of an *obligation* and then fail," *i.e.*, a change in circumstances as to *cause* may vitiate consent after the fact. *Id.* (quoting Litvinoff, *Still Another Look At Cause*, 48 La. L. Rev. 3, 8 (1987)). For example, in *Angelo & Son, LLC v. Piazza*, 1 So. 3d 705, 710 (La. Ct. App. 2009), the court held that consent had been vitiated when certain factors disappeared following the transfer of property from father to daughter. The daughter and her husband purchased her parents' property and also a used car business under the impression that they would be helping the father ease into retirement, receive the goodwill of the business, and have the father's assistance in learning to run the business. *Id.* After the sale, the father instead started a new, competing business with his son down the street, failed to assist his daughter's business, and actively worked to sabotage the goodwill associated with his former business. *Id.* The court found that the father's change in course vitiated the daughter's consent, *i.e.*, the cause of the contract, "the reason without which the [plaintiffs] never would have entered into the used

12

car business, failed." *Id.* When those factors disappeared, the plaintiffs "were left with a business and house they may have never really wanted in the first place, but for the family considerations." *Id.* Accordingly, the sale of the house and business was rescinded. *Id.* at 713.

More recently, in *Bluebonnet Hotel Ventures, LLC v. Wachovia Bank, N.A.,* 10-489-JJB-DLD (Ruling on Motion to Dismiss) (M.D. La. Sept. 29, 2011), the United States District Court for the Middle District of Louisiana, in applying Louisiana law, held that "changed circumstances may constitute failure of cause when the 'cause' is within the control of the party seeking to enforce the contract." *Id.* There, Bluebonnet Hotel Ventures, LLC was formed for the purpose of constructing a hotel. Bluebonnet sought to finance the project through the issuance of bonds and needed a letter of credit to make its bonds more marketable and attractive to investors. Wells Fargo and Bluebonnet exchanged a letter of intent regarding the letter of credit, and Wells Fargo tentatively agreed to underwrite and market the bonds. Wells Fargo also coaxed Bluebonnet into entering into a swap agreement "whereby the anticipated bonds Bluebonnet planned to issue at variable interest rates could be hedged by essentially adjusting the bonds to a fixed rate based on the interest rate swap." *Id.* When it came time to issue the letter of credit, Wells Fargo issued one with terms differing from those proposed in the letter of intent. Bluebonnet balked and issued the bonds without the letter of credit. Without the letter of credit, Bluebonnet sold only a small portion of the bonds. It then initiated an action for failure of cause to rescind the swap agreement with Wells Fargo. On Wells Fargo's motion to dismiss, the district court concluded that Louisiana courts routinely recognize claims for failure of cause where circumstances have changed as result of actions on the part of the party seeking to enforce the contract. *Id.* It denied Wells Fargo's motion on the basis that Bluebonnet had stated a valid claim for failure of cause because the complaint alleged that the operative contract, the credit

13

swap agreement, failed for cause "due to Wells Fargo's failure to issue the letter of credit, which doomed the bond issuance for the hotel, the obvious reason why Bluebonnet contemplated the swap agreement in the first place." *Id.*

The majority cites *Bluebonnet* for purposes of defining failure of motive and failure of cause. Their opinion, however, notably fails to recognize *Bluebonnet*'s clear pronouncement that, although less obvious but "no less important," "a fact which a party or both parties assumed would come into existence, but in fact did not based on changed circumstances, results in failure of cause." *Id.* at 9.

In opining that "Louisiana courts are likewise hesitant to vitiate a contract due to error when the error concerns an event that is expected to take place in the future," *In re Merrill Lynch ARS Litig.*, 2010 WL 19424719, at *6 (citing *St. Charles Ventures*), the district court here failed to consider that the pertinent language from *St. Charles Ventures* was addressing a non-actionable *failure of motive* claim, not a *failure of cause* claim—the latter, of course, being a basis for a viable cause of action. The district court's error in thus not distinguishing between a failure of motive and failure of cause is key because *St. Charles Ventures* did in fact recognize that a prospective failure of "cause" could vitiate consent after the fact. 265 F. Supp. 2d at 688 ("[I]t is clear that a cause may exist at the inception of an obligation and then fail.") (quotation marks and alterations omitted). Examining *Bluebonnet, St. Charles Ventures* and *Angelo & Sons* demonstrates clearly that Louisiana courts do recognize that error of fact due to changed future circumstances may be a basis on which to rescind a contract (obligation) and that it was error for the district court in the instant case to begin its analysis with a presumption against rescission.

14

The district court's analysis of the failure of cause claim was further compromised by the way in which it characterized the failure of cause claim and by attributing LSED's ignorance about FGIC's creditworthiness or investment practices to "inexcusable ignorance, neglect, and want of care." *In re Merrill Lynch ARS Litig.*, 2010 WL 1924719, at *5 (quoting *Scott v. Coushatta*, 512 So. 2d 356, 362 (La. 1987)). The district court characterized LSED's "cause" as being "thirty years of guaranteed credit enhancement through FGIC's maintenance of its triple-A ratings" and noted that FGIC had expressly disclaimed any guarantee to maintain a triple-A rating for thirty years. *Id.* at *10. In doing so, however, the court did not accept all of LSED's factual allegations as true, nor did it draw all reasonable inferences in favor of LSED as it was required to do under the standard for evaluating motions to dismiss. *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). The majority makes the same mistake in affirming the district court.

While true that Louisiana courts will not rescind contracts based on failure of cause where the unilateral error of fact is due to the plaintiff's "inexcusable ignorance, neglect, and want of care," nothing pleaded in the complaint suggests that LSED was aware or should have been aware that FGIC had altered its business practices in a manner going to the very reason why LSED spent millions of dollars to purchase FGIC's bond insurance—namely, FGIC's creditworthiness derived from conservative, remote-loss practices. The fact that LSED understood that FGIC could not guarantee its AAA rating, as suggested by the disclaimer on which the majority relies, does not mean that it also knew or should have known that FGIC was embarked on an affirmative course to engage in business practices that would put its creditworthiness at so much risk as to render its bond insurance unsuitable for the reason it was purchased. This is particularly so where FGIC had not disclosed its increased risk portfolio

15

despite its alleged representations to the contrary. In short, without discovery concerning LSED's reading and understanding of its agreement with FGIC, it is premature to rely, as the district court and the majority do, on the bare terms of the agreement as a basis for concluding that LSED exhibited "inexcusable ignorance, neglect, and want of care." *See Bluebonnet,* ("the [contract] provisions only have force if the [contract] itself is found valid: Bluebonnet's failure of cause claim attacks the validity of the agreement by attacking the cause. Logic dictates that the inquiry into the agreement's validity (and thus into "cause") precedes any inquiry into the interpretation and the construction of the agreement itself.")

Additionally, given that "failure of cause" is not a cause of action recognized by common law jurisdictions, the majority and the district court erred in relying on the common law of other states as a basis for concluding that LSED's cause was not reasonable. *See In re Merrill Lynch ARS Litig.*, 2010 WL 1924719, at *7 (citing *NPS, LLC v. Ambac Assurance Co.*, 706 F. Supp. 2d 162 (D. Mass. 2010) and *Water Works Bd. of the City of Birmingham v. Ambac Fin. Group, Inc.*, 718 F. Supp. 2d 1317 (N.D. Ala. 2010)). The cases cited in the majority opinion are similarly unavailing because they assume inaccurately that LSED's error in judgment was founded upon an erroneous assumption of market conditions. Were it up to me, therefore, I would hold that LSED's claim for failure of cause is not summarily foreclosed as a matter of Louisiana law.

B.     "Failure of Cause" and "Failure of Motive"

I turn now to explain why I would certify this matter to the Louisiana Supreme Court. In holding that it was not reasonable for LSED to believe that its contract with FGIC would guarantee thirty years of credit enhancement, the district court failed to distinguish between cause and motive. Juxtaposed to failure of cause is what, under Louisiana law, is termed "failure of motive." While failure of "cause" can be a basis for rescinding an obligation, a failure of

16

"motive" cannot. That is, changed circumstances going to *motive* rather than *cause* are not sufficient to vitiate consent. Noting the revision of the Civil Code in 1984, which removed the word *motive* from the relevant articles addressing *failure of cause*, *St. Charles Ventures* explained that unlike *cause*, which goes to "the nature of the thing sold and its suitability for its intended use" or, put differently, "the suitability of the thing purchased in relation to the reason or cause of the purchaser so doing," *motives* "rest in the subjective sphere of the individual" so that "an error in the motive does not annul the contract even though it exerts a decisive influence on the obligation." *Id.* at 689–91 (quoting La. Civ. Code. art. 1950 cmt. f). For example, holding that the purported "cause" underlying the obligation at issue was really a *motive* for entering the contract, i.e., the improbability that another retailer would open a store in a particular New Orleans neighborhood, the court in *St. Charles Ventures* rejected the plaintiff's failure of cause claim, noting that there was nothing different *in fact* about the suitability of the leased premises, other than the arrival of another retailer in the neighborhood. *Id.* at 694–95; *see also Superior Oil Co. v. Transco Energy Co.*, 616 F. Supp. 98, 109 (W.D. La. 1985) (rejecting plaintiff's failure of cause claim as a non-cognizable failure of motive claim and noting that "[c]ause—or end—is distinguishable from the motive that prompts the debtor to bind himself" and although "motive bears a decisive influence upon the party's will . . . an error of motive does not nullify the obligation") (quoting 1 Litvinoff § 220, Louisiana Civil Law Treatise, 1969)).

In applying *St. Charles Ventures*' analysis of failure of motive to its analysis of LSED's failure of cause claim, the district court here conflated what should have been separate analytical undertakings. As I understand the distinction between failure of cause and failure of motive as explained in *St. Charles Ventures*, I would hold that it is possible to distinguish between a cause and a motive in the present situation—LSED's motive in paying a $13 million premium for bond

17

insurance was to achieve lower interest rates on the bonds. It is not suing FGIC simply because the motive in purchasing the bond insurance failed to materialize despite FGIC's best efforts. Rather, as discussed *supra* at I.A., LSED's principal cause was to purchase a credit enhancement from a credible, creditworthy insurer.

As demonstrated by *St. Charles Ventures*, courts and litigants alike must recognize the difference between "failure of cause" and "failure of motive" when analyzing or pleading failure of cause claims. But the district court here is not alone as this issue is one that appears to create some confusion in the Louisiana courts as well. The confusion derives in part from the disappearance of "motive" from the revised Code. *See, e.g., Hanover Petroleum Corp. v. Tenneco, Inc.*, 521 So.2d 1234, 1240 (La. App. Ct. 1988) (stating, in error, that articles 1948 and 1949 provide that "consent may be vitiated by error only when it concerns the principal cause or motive and that cause or motive was known or should have been known to the other party"). *St. Charles Ventures* appears the best effort to date by any court in Louisiana to decipher the difference between actionable failure of cause and non-actionable failure of motive. For that reason and also because the determination would resolve the issue over which the majority and I differ, I believe it would be worthwhile for the Louisiana Supreme Court to weigh in on this issue and resolve the ongoing confusion in the lower courts.

A careful reading of relevant provisions of the Louisiana Civil Code and accompanying state court decisions reveals that the difference between "cause" and "motive" is oftentimes subtle and certainly can lead to confusion. A significant source of the confusion between what the Louisiana courts recognize as "cause" (the failure of which provides a basis for rescission) and what they deem to be "motive" (not a basis for rescission) appears to have arisen from the 1870 Code provisions defining the cause of action for failure of cause. For example, Article

18

1823 of the 1870 Code states that "[e]rrors may exist as to all circumstances and facts which relate to a contract, but it is not every error that will invalidate it. To have that effect, the error must be in some point, which was a principal cause for making the contract, and it may be either as to the *motive* for making the contract, to the person with whom it is made, or to the subject matter of the contract itself." (emphasis added). Article 1825 states further that "[t]he error in the cause of a contract to have the effect of invalidating it, must be on the principal cause, when there are several; this principal cause is called the *motive*, and means that consideration without which the contract would not have been made." (emphasis added). Finally, Article 1826 states that "[n]o error in the *motive* can invalidate a contract, unless the other party was apprised that it was the principal cause of the agreement, or unless from the nature of the transaction it must be presumed that he knew it." (emphasis added). Accordingly, it would appear that under the 1870 Civil Code, failure of motive *could* provide a basis for rescinding the contract, but only if certain conditions were met, i.e., motive was a principal *cause* of the contract and the other party was aware, or should have been aware, of it. The difficulties raised by defining a cause of action in terms of a word that in some instances adequately describes the viable cause of action and in other instances bars such action are readily appreciated.

The drafters of the 1984 Civil Code apparently sought to remedy the confusion, by removing the term "motive" altogether from the relevant provisions addressing failure of cause. Article 1950 of the 1984 Code states that "[e]rror may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation." That is, the relevant code provisions no longer use the term "motive" to help define "cause." As

19

highlighted above, the comments to Article 1950 make clear that the term failure of motive may no longer be used to describe a claim for rescinding a contract—"an error in the motive does not annul the contract even though it exerts a decisive influence on the obligation." La. Civ. Code. art. 1950 cmt. f.

The removal of "motive" from the failure of cause provision in the 1984 revision to the Civil Code appears understandably to have created some confusion in the Louisiana courts. *See, e.g.*, *Hanover Petroleum Corp.*, 521 So. 2d at 1240 (stating, incorrectly, that articles 1948 and 1949 provide that "consent may be vitiated by error only when it concerns the principal cause *or motive* and that cause *or motive* was known or should have been known to the other party" [emphasis added]). Indeed, courts in Louisiana have continued to cite cases decided prior to 1984, in particular *Carpenter v. Williams*, 428 So.2d 1314 (La. App. Ct. 1983), which rescinded a contract for the sale of a home where the buyer's reason for purchasing the house—relocation for a new job—vanished.

> In these cases the parties entered a contract assuming certain facts or conditions to exist. When the assumed fact or condition was found not to exist or did not come into existence even through the act of third parties ([the employer] in this case), the contracts have been rescinded. With these cases in mind, we find that the principal, and only, *cause or motive* Williams had for entering into the buy-sell agreement with Carpenter was to comply with [the employer's] orders.

*Id.* at 1318 (emphasis added). In my view, *Carpenter* plainly relied on the 1870 Code language for failure of cause when it rescinded the contract on the basis of a failure of motive, *i.e.*, the subjective reason for entering the contract, a job relocation. Compounding the problem, courts have cited *Carpenter* as purporting to set forth the correct analysis for failure of cause claims notwithstanding the fact that, first, *Carpenter* was decided prior to the 1984 Code revision and, second, it might well be decided differently under the revised Code given that the failure of

20

cause upon which the *Carpenter* Court rescinded the contract was ostensibly better described as a failure of motive unrelated to the principal cause for entering the obligation. *See, e.g.*, *In re Cajun Elec. Power Co-op Inc.*, 230 B.R. 693, 714 n.34 (Bankr. M.D. La. 1999) (citing *Carpenter* for the proposition that "Louisiana has a substantial body of longstanding jurisprudence recognizing failure of cause as a basis for the invalidation of contracts"). Without getting into whether *Carpenter* was rightly or wrongly decided under the 1870 Code, at the very least, *Carpenter*'s definition of "cause" is too expansive to remain persuasive following the 1984 Code revision. That *Carpenter* continues to be cited for its broad definition is troubling. While this is another reason to vacate the decision below and permit LSED's claims to proceed, it is also a reason to certify the proposed question to the Louisiana Supreme Court.

II.     Breach of an Implied Obligation

Equally unpersuasive is the majority's contention that LSED does not state a valid claim for breach of implied obligation under Louisiana law. LSED asserts that FGIC breached its contract by (1) impairing its own creditworthiness and (2) rendering itself unable to pay claims. The district court rejected this claim, holding that absent an express clause guaranteeing that FGIC would maintain its AAA rating, the court would not imply such a term in the contract. *In re Merrill Lynch ARS Litig.*, 2010 WL 19424719, at *13. Although LSED concedes that there is no express provision requiring that FGIC maintain a certain credit rating, or any credit rating for that matter, LSED contends that FGIC had an implied obligation not to squander its creditworthiness. According to LSED, financial stability was necessary to a bond insurer's ability to pay claims on insured bonds and thereby enhance the issuer's credit. LSED contends that FGIC breached that implied obligation when it began underwriting unprecedented risks in volatile markets, thereby putting its own financial stability in jeopardy. LSED argues that

21

regardless whether FGIC maintained a AAA rating specifically, the $13 million was paid for *some* level of credit enhancement, and so, by losing its credit rating entirely, FGIC breached its contract. LSED acknowledges that FGIC could not guarantee a AAA rating because third-party ratings agencies set the rating. That said, FGIC *did* have control over its own financial stability and, by expressly promising to pay on claims in the event of LSED's default and thereby enhance LSED's credit, it necessarily had an implied obligation to keep itself financially stable in order to make good on that express promise.

A. LSED's Breach of Implied Obligation Claim

Again, rather than viewing the allegations in the complaint in the light most favorable to the plaintiff, the district court and the majority have characterized the claim for breach of implied obligation in a manner that does not present LSED's cause of action in the strongest terms possible based on the pleadings. Their rationales focused solely on whether FGIC had an obligation to maintain an AAA rating. Finding no express language requiring FGIC to maintain such rating, and relying on the decisions in *NPS* and *Water Works*, which held that there was no breach of contract against a bond insurer for letting its rating slip from AAA to AA, the district court held that there was no breach of contract when FGIC lost its credit rating. Characterizing the implied obligation as one to maintain a credit rating, the district court declined to read such an obligation into the contract.

Louisiana recognizes implied obligations. Article 2054 of the Civil Code states that "[w]hen the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose." Article 2054 is the successor to article 1903 of the Civil

22

Code of 1873, in effect prior to 1984. In *National Safe Corp. v. Benedict & Myrick, Inc.*, 371 So. 2d 792, 795 (La. 1979), the Louisiana Supreme Court interpreted article 1903 to require "that contracts are to be understood, not only from what is expressed, but also everything that by law, equity or custom is considered as incidental to the particular contract, or necessary to carry it into effect." *See also McKee v. Southfield Sch.*, 613 So.2d 659, 662 (La. Ct. App. 1993) (holding contract between a parent and private school for the education of child contained implied obligation by school to provide written verification of that education).

Under applicable Louisiana law, LSED argues that a bond insurer without a credit rating or the ability to pay claims would not be able to sell bond insurance. For that reason, there is an implied obligation on the part of the insurer to maintain creditworthiness and the ability to pay claims under the contract. Put differently, demonstrating creditworthiness and the ability to pay claims—neither of which FGIC can currently do—are an implied obligation under the contract for bond insurance.

Significantly, nowhere in its decision does the district court address the concept set forth in Louisiana Civil Code article 2054 that under Louisiana law there is an implied obligation to undertake whatever conduct is necessary to carry out the express provisions of a contract. To this point LSED argues that it has adequately pleaded FGIC breached an implied obligation on the part of any bond insurer—maintaining creditworthiness and an ability to pay claims as they are made. Without those attributes, FGIC is unable to carry out its express agreement. FGIC, on the other hand, seeks to characterize LSED's argument slightly differently—asserting that the contract is not ambiguous and that LSED should not be permitted to introduce extrinsic materials to explain the intent of the contract, which can be determined on its face to disclaim any guarantee to maintain AAA ratings. In doing so, however, FGIC does not contest the thrust of

23

those extrinsic materials—that they "stand only for the basic uncontroversial proposition that bond insurance, by guaranteeing payment on the bonds in the event of a default by the issuer, is a form of credit enhancement. . . . because it promises to cover the issuer's obligations in the event of a payment default." FGIC attempts to distinguish *National Safe* on the ground that it also involved allegations that the defendant breached the implied obligation of good faith and fair dealing. Although that case did involve a question of a breach of good faith, I do not read *National Safe*'s interpretation of article 1903 as limited to that particular implied obligation.

While I would agree with the district court and the majority that there is no express requirement in the contract that FGIC maintain a AAA rating, there is merit in the plaintiffs' argument that there is at least an issue of fact whether the need to maintain a credit rating of any kind, and not be banned by the New York State Insurance Department from paying out claims, is a breach of an implied obligation that is necessary for achieving the express provisions of the contract, i.e., to provide bond insurance. The district court and the majority have, again, overlooked the unique facets of the Louisiana Civil Code—to wit, to find an implied obligation under article 2054 does not require a determination that the contract is otherwise ambiguous. For these reasons, I would vacate the district court's dismissal of LSED's claim for breach of implied and remand for further proceedings.

B. Ban on Unjust Enrichment or More Expansive Principle of Equity

Given the lack of clarity on when Louisiana law permits an obligation to be implied, LSED's claim cannot be resolved on the face of the complaint as a matter of law. I note again that federal and state courts analyzing breach of implied obligation claims remain conflicted over whether article 2054 is an equitable principle greater than a simple ban on unjust enrichment. *Owl Constr. Co. v. Ronald Adams Contractor, Inc.,* 642 F. Supp. 475, 479 (E.D. La. 1986);

24

*Morphy, Makofsky & Masson v. Canal Place 2000,* 538 So. 2d 569, 574 n.8 (La. 1989); *Gibbs Constr. Co. v. Thomas,* 500 So. 2d 764, 767 (La. 1987); *but see Hendricks v. Acadiana Profile, Inc.,* 484 So. 2d 242, 245-46 (La. Ct. App. 1986); *Am. Bank & Trust of Coushatta v. FDIC*, 49 F.3d 1064, 1067–68 (5th Cir. 1995). Furthermore, following the 1984 revision of the Civil Code, the Louisiana Supreme Court has not decided a case interpreting article 2054 on points relevant to the claims raised here. Accordingly, while I would predict the Louisiana Supreme Court would hold that the pleading here presents a viable a breach of implied obligation claim, for the same reasons I would certify the issue of failure of cause, I would certify this question as well.

**III. Conclusion**

This case involves causes of action unique to the State of Louisiana—failure of cause and breach of an implied obligation. It cannot be denied that the Louisiana Supreme Court is the final arbiter in interpreting the Louisiana Civil Code. The varied holdings in case law defining both types of claims has created confusion as to the scope of those claims and limited the confidence with which common law-trained jurists may divine how Louisiana law would bear on the facts alleged in this complaint. As the highest court of the only jurisdiction in the United States to have a civil law system, the Louisiana Supreme Court can bring clarity to these issues, which would then be dispositive of this appeal and, going forward, would minimize misinterpretation of Louisiana's laws by the courts in the other 49 states.

Accordingly, I cannot join the majority's opinion affirming the district court's dismissal of LSED's amended complaint in this action as I believe the district court overlooked significant nuances in the pleading of claims for failure of cause and breach of implied obligation, nuances

25

which undoubtedly would benefit from clarification by the Louisiana Supreme Court.  For the reasons stated, I respectfully dissent.